appropriate. *International Union of District 50, United Mine Workers v. Bowman Transportation, Inc.,* supra.

Accordingly, the Union's motion for summary judgment is sustained and Western's motion for summary judgment is denied, and it is hereby ordered that enforcement of the Arbitrator's award is granted.

**Sylvia MEEK et al., Plaintiffs,**

**v.**

**John C. PITTENGER, as Secretary of Education of the Commonwealth of Pennsylvania and Grace M. Sloan, as Treasurer, Defendants,**

**Jose Diaz et al., Intervening Parties Defendants.**

**Civ. A. No. 73–269.**

United States District Court,
E. D. Pennsylvania.

Feb. 11, 1974.

Wolf, Block, Schorr & Solis-Cohen, by William P. Thorn, Philadelphia, Pa., Leo Pfeffer, New York City, for plaintiffs.

J. Justin Blewitt, Jr., Deputy Atty. Gen., for defendants.

Ball & Skelly by William B. Ball, Joseph G. Skelly, Harrisburg, Pa., for intervenors, Powell and Watson.

Ronal, Stevens & Young, by C. Clark Hodgson, Jr., Philadelphia, Pa., for intervenors, Diaz, Zimmerspitz and Hassall.

Duane, Morris & Heckscher by James E. Gallagher, Jr., Henry T. Reath, Jane Elliott, Philadelphia, Pa., for intervenors Chesick, Boozer, Pennsylvania Association for Independent Schools and Springside School.

Before GIBBONS, Circuit Judge, and HIGGINBOTHAM and BECHTLE, District Judges.

## OPINION

GIBBONS, Circuit Judge.

In this action the plaintiffs challenge the constitutionality of two Pennsylvania statutes, Act 194, July 12, 1972, Pa. Stat. tit. 24, § 9–972 and Act 195, July 12, 1972, Pa.Stat. tit. 24, § 9–972. Both are claimed to transgress the first amendment in two separate respects, set forth as separate counts in the complaint. The First Count alleges that the statutes violate the establishment clause. The Second Count alleges that the statutes constitute compulsory taxation for the support of religion or religious schools and thereby interfere with the plaintiffs' free exercise of their religion in violation of the free exercise clause. In both counts the complaint seeks an injunction against the expenditure of any funds pursuant to either statute. A three-judge district court was convened pursuant to 28 U.S.C. §§ 2281–2284. The case is before that court on final hearing.

### I. THE PARTIES

There are three individual and four organizational plaintiffs. The individual plaintiffs are Sylvia Meek, Bertha G. Myers and Charles A. Weatherley, each of whom is a resident taxpayer of the Commonwealth of Pennsylvania. The organizational plaintiffs, American Civil Liberties Union, National Association for the Advancement of Colored People, Pennsylvania Jewish Community Relations Council, and Americans United for Separation of Church and State, each has members who are taxpayers of the Commonwealth.

The original defendants are John C. Pittinger, Secretary of Education of the Commonwealth and Grace M. Sloan, Treasurer of the Commonwealth.

A number of parties having varying interests were permitted to intervene as defendants. The individual intervening defendants include parents of children who are receiving benefits under one or both statutes. Of these, the defendants John P. Chesick, Mrs. Robert Boozer, Seth W. Watson, Jr. and Anne P. Watson are parents of beneficiary children who attend nonpublic nonsectarian schools in Pennsylvania. The defendants Jose Diaz, Enilda Diaz, William Zimmerspitz, Nancy Zimmerspitz, Thomas J. Hassall, Marie Hassall, Daniel F. X. Powell and Anna T. Powell are parents of beneficiary children attending nonpublic church-related schools in Pennsylvania. One minor child of two of the intervening defendants is a mentally retarded child attending a church-related school for exceptional children. The defendant Pennsylvania Association of Independent Schools is an organization of nonpublic nonsectarian schools attended by students who qualify as beneficiaries under the challenged acts. The defendant Springside School is a nonpublic nonsectarian school attended by students who qualify as beneficiaries under the challenged statutes.

### II. THE PLEADINGS AND THE RECORD

Under the Court's supervision the parties engaged in extensive pretrial negotiations which led to the entry of a joint final pretrial order containing twenty-eight stipulations of fact, a list of exhibits which were ultimately received in evidence, and a list of potential witnesses. At a hearing on plaintiffs' motion for a preliminary injunction on September 10, 1973 the testimony of some of these witnesses was received. Pursuant to Rule 65(a)(2) the Court directed that the trial of the action on the merits be advanced and consolidated with the hearing on that application. The plaintiffs were afforded the opportunity to supplement the testimony offered on September 10, 1973, but elected to rest on that record. Thus the case is before us on final hearing on the pleadings, the stipulations set forth in the joint final pretrial order and the evidence received at the hearing on September 10, 1973. This opinion comprises our findings of fact and conclusions of law.

## III. THE STATUTES INVOLVED

Acts 194 and 195, both of which became law on July 12, 1972, are amendments to the Pennsylvania Public School Code of 1949, Pa.Stat. tit. 24, §§ 1–101 to 27–2702, which embodies the Commonwealth's comprehensive scheme for educating all children of elementary and secondary school age. The Code defines compulsory school age as not later than eight years and until seventeen years of age. Pa.Stat. tit. 24, § 13–1326. It provides:

> Every parent, guardian, or other person having control of charge of any child or children of compulsory school age is required to send such child or children to a day school in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language. Pa.Stat. tit. 24, § 13–1327.

The Code recognizes that the requirements of the compulsory attendance law may be met at a nonpublic school so long as the subjects and activities in such school meet the standards of the State Board of Education and are taught in the English language. *Id.* The only exceptions to compulsory school attendance are those set forth in Pa.Stat. tit. 24, § 13–1330. These include certain children fourteen years of age or older to whom employment certificates have been issued under authority of the Superintendent of Public Education, and children who have been found, after examination, to be so mentally retarded as to be unable to profit from further school attendance. The Commonwealth imposes the requirements of licensing and inspection by a State Board of Private Academic Schools on the nonpublic schools here involved, except for those operated by or under the authority of bona fide religious institutions. Pa.Stat. tit. 24, §§ 2731–2743. It imposes on principals and teachers in all schools, public and nonpublic, nonsectarian or religious, the duty of reporting to the district school superintendent the names and addresses of all children enrolled, and any failure of the children to attend school in compliance with the compulsory attendance law. Pa.Stat. tit. 24, § 13–1332. This reporting provision is enforced by a criminal sanction. Pa. Stat. tit. 24, § 13–1355. The Code evidences the strong public policy of the Commonwealth that every child of compulsory school age be educated for functional adult citizenship to the level of minimum state standards. Under various provisions of the Code the Commonwealth has provided to pupils attending public schools, through several levels of state and local officials, certain auxiliary services aimed at the achievement of such a minimum level of educational achievement. To the same end, under other provisions of the Code it furnishes to pupils attending public schools textbooks, instructional materials and instructional equipment.

Act 194 provides that acting through the same state and local officials as in the case of pupils attending public schools, the Commonwealth will provide auxiliary services

> . . . to all children who are enrolled in grades kindergarten through twelve in nonpublic schools wherein the requirements of the compulsory attendance provisions of this act may be met and which are located within the area served by the intermediate unit, such auxiliary services to be provided in their respective schools.

The Intermediate Units referred to are established by another part of the Code. All public school districts in the Commonwealth are assigned to one of twenty-nine such units which have the function of furnishing auxiliary services to such school districts. Pa.Stat. tit. 24, §§ 9–951 to 9–971. These services include but are not limited to curriculum development and instructional improvement services, educational planning services, instructional materials services, continuing professional education services, State and Federal agency liaison services, management services, classes and schools for exceptional children, audiovisual libraries and instructional materi-

als centers. Pa.Stat. tit. 24, § 9–964. The Commonwealth finances these services. Pa.Stat. tit. 24, §§ 9–957, 9–970.

Act 194, section 1(b), defines auxiliary services as:

> guidance, counseling and testing services; psychological services; services for exceptional children; remedial and therapeutic services; speech and hearing services; services for the improvement of the educationally disadvantaged (such as, but not limited to, teaching English as a second language), and such other secular, neutral, non-ideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth.

All the auxiliary services listed in section 1(b) are presently provided for public school children at public expense either through the Intermediate Units or through local public school districts.

Act 195, section 1(c) provides:

> Loan of Textbooks. The Secretary of Education directly, or through the intermediate units, shall have the power and duty to purchase textbooks and, upon individual request, to loan them to all children residing in the Commonwealth who are enrolled in grades kindergarten through twelve of a nonpublic school wherein the requirements of the compulsory attendance provisions of this act may be met. Such textbooks shall be loaned free to such children subject to such rules and regulations as may be prescribed by the Secretary of Education.

Textbooks are defined in section 1(b):

> "Textbooks" means books, reusable workbooks, or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available for the individual use of each pupil in such class or group. Such textbooks shall be textbooks which are acceptable for use in any

public, elementary, or secondary school of the Commonwealth.

Section 1(d) limits the state's obligation to purchase textbooks for loan to nonpublic school students to a total amount not exceeding ten dollars multiplied by the number of children enrolled in nonpublic schools.

Act 195, section 1(e) provides:

> Purchase of Instructional Materials and Equipment. Pursuant to requests from the appropriate nonpublic school official on behalf of nonpublic school pupils, the Secretary of Education shall have the power and duty to purchase directly, or through the intermediate units, or otherwise acquire, and to loan to such nonpublic schools, instructional materials and equipment, useful to the education of such children, the total cost of which, in any school year, shall be an amount equal to but not more than twenty-five dollars ($25) multiplied by the number of children residing in the Commonwealth who on the first day of October of such school year, are enrolled in grades kindergarten through twelve of a nonpublic school in which the requirements of the compulsory attendance provisions of this act may be met.

Instructional materials and instructional equipment are defined in section 1(b):

> "Instructional materials" means books, periodicals, documents, pamphlets, photographs, reproductions, pictorial or graphic works, musical scores, maps, charts, globes, sound recordings, including but not limited to those on discs and tapes, processed slides, transparencies, films, filmstrips, kinescopes, and video tapes, or any other printed and published materials of a similar nature made by any method now developed or hereafter to be developed. The term includes such other secular, neutral, non-ideological materials as are of benefit to the instruction of nonpublic school children and are presently or hereafter pro-

vided for public school children of the Commonwealth.

"Instructional equipment" means instructional equipment, other than fixtures annexed to and forming part of the real estate, which is suitable for and to be used by children and/or teachers. The term includes but is not limited to projection equipment, recording equipment, laboratory equipment, and any other educational secular, neutral, non-ideological equipment as may be of benefit to the instruction of non public school children and are presently or hereafter provided for public school children of the Commonwealth.

Both acts have an identical severability clause:

If any part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid, in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

Thus each program under both statutes must be considered separately, both facially and as applied. We are dealing, then, with four separate programs:

1. The auxiliary services program, under which public employees of the Intermediate Units furnish to children attending nonpublic schools the same auxiliary services as are furnished to children attending public schools.

2. The textbook loan program, under which the Commonwealth loans to children attending nonpublic schools textbooks for their individual use which are acceptable for use in public schools.

3. The instructional materials loan program, under which the Commonwealth loans to nonpublic schools the same instructional materials as are furnished for public school children. The difference between the textbook loan program and the instructional mate-

rials loan program is that the latter covers materials not intended for individual use, either because, in the case of certain audio-visual materials, group use is more appropriate, or because unlike books, the materials are not readily portable, or because equipment is required for their use, or because unlike books they can readily be used by more than one student.

4. The instructional equipment loan program, under which the Commonwealth loans to nonpublic schools instructional equipment which like the instructional materials is not suitable for loan to individual students.

## IV. PLAINTIFFS' CONTENTIONS

Plaintiffs contended, prior to the conclusion of final hearing, that each of the four programs was facially unconstitutional both under the establishment clause and under the free exercise clause, and that each of the programs as applied was unconstitutional under both clauses. After both sides had rested, however, plaintiffs moved to amend the complaint to limit it to an attack on the statutes on their face, so as to eliminate any res adjudicata effect of a judgment insofar as the acts were construed and applied by the Commonwealth defendants. We permitted both sides to file briefs on that motion. We conclude that it would be improper, the case having been fully tried, to permit what would amount to a voluntary dismissal of a major part of it, at that stage. *See* Fed.R.Civ.P. 41(a)(2); Fed.R.Civ.P. 15(a). Thus we must dispose of plaintiffs' contentions both of facial unconstitutionality and of unconstitutionality as applied, and both of violation of the establishment clause, Count I, and of interference with plaintiffs' free exercise of religion, Count II.

## V. STANDING ISSUES

The defendants challenge the standing, both of the individual and of

the organizational plaintiffs. The individual plaintiffs are taxpayers of the Commonwealth. As such they have standing to challenge a Commonwealth expenditure of funds which they contend is prohibited by the establishment clause. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The organizational plaintiffs all have members who are taxpayers of the Commonwealth. Though their standing is not as clear as that of the individual plaintiffs, we conclude that they have standing, by virtue of the their members' status as taxpayers, to challenge a Commonwealth expenditure of funds which they contend is prohibited by the establishment clause. *See, e. g.,* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970). Thus both the individual plaintiffs and the organizational plaintiffs have standing to proceed with the first count.

 The factual allegation upon which the second count is predicated is in paragraph 9 of the complaint:

9. It is against the religious conscience of each of the plaintiffs to be forced by the operation of the taxing power to contribute to the propagation of religion in general and to religions to which he does not adhere in particular, or for the support or maintenance of sectarian schools or places of worship.

The count then alleges:

12. . . . Each of the Acts on its face and as construed and applied by the defendants, violates the First Amendment to the United States Constitution in that it prohibits the free exercise of religion on the part of the plaintiffs by reason of the fact that it consti-

tutes compulsory taxation for the support of religion or religious schools.

The relief requested is not against collection of the tax, but against the expenditure of funds. *Compare* this *with* Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). There is no allegation as to the effect on conscience of members of any of the organizational plaintiffs, none of which claims to be of a religious character. The allegations of paragraph 9, quoted above, can refer only to individuals, since only they, and not the organizations, have consciences and exercise religions. Thus we conclude that the complaint does not allege facts which would permit the organizational plaintiffs to assert a free exercise claim. As to the individuals, the issue of their standing to assert a free exercise claim is intertwined with the merits of the second count, and will be discussed when we reach the disposition of that count.

## VI. THE ESTABLISHMENT COUNT

### A. *The Governing Standards*

 The cumulative criteria developed by the Supreme Court for judging state expenditure for education against the prohibition of the establishment clause are clear in expression if not in operation.

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

The plaintiffs acknowledge that the Pennsylvania legislature had a legitimate secular purpose in enacting both Act 194 and Act 195.[1] The first criteria

1. The legislative findings are as follows:
 The welfare of the Commonwealth requires that the present and future generations of school age children be assured ample op-

portunity to develop to the fullest their intellectual capacities. To further this objective, the Commonwealth provides, through tax funds of the Commonwealth,

is not an issue as to any of the four programs. Thus we turn to a separate consideration of each program under the two remaining criteria, primary effect and undue entanglement.

Since the Court began in Board of Education v. Allen, 392 U.S. 236, 88 S. Ct. 1923, 20 L.Ed.2d 1060 (1968), to refine what became its cumulative tripartite test it has held statutes authorizing expenditures for education unconstitutional on the primary effect ground in Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), in Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), and in Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973). It found no primary effect defect in the statutes involved in Board of Education v. Allen, *supra*, and in Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). *Cf.* Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L. Ed.2d 697 (1970), involving an exemption from taxation. In Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), it sustained a federal statute after excising a minor feature found to involve an impermissible primary effect. The Court did not reach the primary effect issue in Lemon v. Kurtzman, *supra*. What amounts to an impermissible primary effect must,

therefore, be gleaned by contrasting Levitt v. Committee for Public Education & Religious Liberty, Committee for Public Education & Religious Liberty v. Nyquist, and Sloan v. Lemon on the one side, with Board of Education v. Allen, Walz v. Tax Commission, Tilton v. Richardson and Hunt v. McNair, on the other.

Three New York programs were invalidated in *Nyquist*, the "maintenance and repair" provision, the tuition reimbursement provision, and the tax credit provisions. The "maintenance and repair" statute authorized grants totaling $30 to $40 per pupil directly to sectarian schools with no effective restriction on the use to which the maintenance and repair funds could be put. The Court held that the "effect [of these grants], inevitably, is to subsidize and advance the religious mission of sectarian schools". 413 U.S. at 779–780, 93 S.Ct. at 2969. The tuition reimbursement program provided unrestricted grants to parents to reimburse them for tuition paid at sectarian schools. The Court observed that such grants could not have been given directly to the sectarian schools in the absence of restrictions which would guarantee separation between the secular and the religious functions of the schools. It held that the unrestricted reimbursement of tuition had the effect of providing direct aid to sectarian schools by providing a

auxiliary services free of charge to children attending public schools within the Commonwealth. Approximately one quarter of all children in the Commonwealth, in compliance with the compulsory attendance provisions of this act, attend nonpublic schools. Although their parents are taxpayers of the Commonwealth, these children do not receive auxiliary services from the Commonwealth. It is the intent of the General Assembly by this enactment to assure the providing of such auxiliary services in such a manner that every school child in the Commonwealth will equitably share in the benefits thereof. Act 194, § 1(a), Pa.Stat. tit. 24, § 9–972(a). The welfare of the Commonwealth requires that the present and future generations of school age children be assured ample opportunity to develop to the fullest their

intellectual capacities. To further this objective, the Commonwealth provides, through tax funds of the Commonwealth, textbooks and instructional materials free of charge to children attending public schools within the Commonwealth. Approximately one quarter of all children in the Commonwealth, in compliance with the compulsory attendance provisions of this act, attend nonpublic schools. Although their parents are taxpayers of the Commonwealth, these children do not receive textbooks or instructional materials from the Commonwealth. It is the intent of the General Assembly by this enactment to assure such a distribution of such educational aids that every school child in the Commonwealth will equitably share in the benefits thereof. Act 195, § 1(a), Pa. Stat. tit. 24, § 9–972(a).

direct incentive to parents to send children to such schools. As to the tax credits, it held these to be practically similar to the tuition reimbursement program. This direct incentive, too, was found to be insufficiently restricted to secular purposes. The Pennsylvania tuition reimbursement program invalidated in Sloan v. Lemon was found to be indistinguishable from the New York program invalidated in *Nyquist*. Justice Powell wrote in Sloan v. Lemon:

> The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or as a reward for having done so, at bottom its intended consequence is to preserve and support religion-oriented institutions. 413 U.S. at 832, 93 S.Ct. at 2986.

*Levitt* involved a New York statute providing for direct payments to private schools for expenses incurred in examination and inspection in connection with testing, maintenance of enrollment records, maintenance of pupil health records, and recording of personnel qualifications and characteristics. The payments were calculated on a per pupil basis. As with the maintenance and repair funds considered in *Nyquist*, there was no effective restriction as to the use to which the funds could be put, no duty to account for or refund sums not expended for state mandated secular purposes, and no differentiation between tests including religious content and tests which were purely secular. The Court held that "the aid that will be devoted to secular functions is not identifiable and separable from aid to sectarian activities," and that therefore the statute had the impermissible primary effect of aiding religion. *Id.* at 480, 93 S.Ct. at 2819. From these cases we conclude that state expenditures will be held to violate the primary effect aspect of the tripartite standard if

1. the payment is made directly to a sectarian school and is not effec-

tively restricted to use by that school for secular nonreligious purposes, or

2. the payment is made directly to parents as a reimbursement for expenses incurred in sending children to a sectarian school and the payment is not effectively restricted to reimbursement for expenses for identifiable secular nonsectarian pupil activities or needs.

Board of Education v. Allen, *supra*, upheld against a primary effect challenge New York's textbook loan statute. That case relied heavily on Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), which had upheld New Jersey's statute providing for reimbursement to parents of expenses incurred in busing children to sectarian schools. Tilton v. Richardson, *supra*, upheld against a primary effect challenge the Federal Higher Education Facilities Act of 1963, 20 U.S.C. §§ 711–58, which authorizes direct grants to institutions of higher education for academic facilities. The Act permits grants to sectarian institutions, but only for facilities that will be used for defined secular purposes. It expressly prohibits the use of the facilities for religious instruction, training, or worship. The Court held invalid, however, a section of the statute which imposed a twenty-year limitation on the federal government's remedy of recapture of a facility's present value if this prohibition is violated. Hunt v. McNair, *supra*, upheld against a primary effect challenge the validity of the South Carolina Educational Facilities Act, S.C.Code Ann. § 22–41 *et seq.* (Cum.Supp.1971), which permitted secular institutions to finance the construction of buildings and facilities from the proceeds of revenue bonds issued by a State authority. As with the federal act upheld in Tilton v. Richardson, *supra*, the revenue bond device could not be used for facilities used for sectarian instruction or religious worship. The agreements between the State authority and the institution

all contained inspection and reconveyance provisions to enforce the prohibition. From these cases we conclude that state expenditures for education will be held not to have the primary effect of advancing religion

1. if, although the payment is made directly to a parent, it reimburses the parent for an expense of a pupil activity clearly identifiable as secular or nonreligious, or

2. if, although a property or service is furnished directly to a student, it is clearly identifiable as a secular or nonreligious property or service, or

3. if, although a payment or service is furnished directly to a secular institution, its use is effectively restricted to the secular nonreligious activities of the institution.

The excessive entanglement refinement first appeared in Walz v. Tax Commission, *supra*, as a justification for the obvious benefit conferred upon religious institutions exempted by New York law from property taxation. Chief Justice Burger wrote:

> The test is inescapably one of degree. Either course, taxation of churches or exemption, occasions some degree of involvement with religion. Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and other direct confrontations and conflicts that follow in the train of these legal processes. 397 U.S. at 674, 90 S.Ct. at 1414.

What started in *Walz* as a justification for exemption from taxation, however, became in Lemon v. Kurtzman, *supra*,

the third criterion of the Court's tripartite limitation upon expenditures. Statutes authorizing educational expenditures were held to be unconstitutional on the ground of excessive entanglement in that case, which involved Rhode Island and Pennsylvania enactments. Challenges to educational expenditure statutes on entanglement grounds were rejected in Tilton v. Richardson, *supra*, and Hunt v. McNair, *supra*. Board of Education v. Allen, *supra*, was decided before the excessive entanglement criterion became explicit, but the *Allen* Court implicitly rejected an attack on that ground. *See, e.g.*, 392 U.S. at 245, 88 S.Ct. 1923. What amounts to an impermissible entanglement of government in religion must, therefore, be gleaned by contrasting Lemon v. Kurtzman on the one side, with Board of Education v. Allen, Tilton v. Richardson and Hunt v. McNair, on the other.[2]

■■ Significantly, in no educational expenditure case decided on entanglement grounds has the Court ruled that the statute in question was facially unconstitutional. In the case of the Rhode Island statute there was a lengthy evidentiary hearing which resulted in extensive findings by the district court on the potential ·for excessive entanglement from comprehensive, extensive and continuing state surveillance. *See* 403 U.S. at 615, 91 S.Ct. 2105. In the case of the Pennsylvania statute the Court had before it a complaint which had been dismissed for failure to state a claim for relief. The allegations of the complaint described a statute and a religious school system similar to that of Rhode Island. The dismissal was reversed and the case remanded for further proceedings.[3] In Tilton v. Richard-

---

2. Neither Committee for Public Education & Religious Liberty v. Nyquist, *supra*, Levitt v. Committee for Public Education & Religious Liberty, *supra*, nor Sloan v. Lemon, *supra*, were decided on entanglement grounds. In *Nyquist*, however, the opinion of the Court, citing Lemon v. Kurtzman, 403 U.S. at 625, 91 S.Ct. 2105, did refer to the need for recurring appropriations as a source of potential divisiveness and a possi-

ble warning signal. 413 U.S. at 796, 93 S. Ct. 2955. *See* discussion at pages 661–662, *infra*.

3. Summary judgment was granted in favor of plaintiffs restraining payments under the Pennsylvania statute for services performed or costs incurred after the Supreme Court's decision. *See* Lemon v. Kurtzman, 348 F. Supp. 300, 301 n.1 (E.D.Pa.1972) (3-judge

son, *supra,* the appeal arose after an evidentiary hearing in which a three-judge district court made findings respecting the relationship between the religious institutions and the government. The Court looked at the record facts and concluded that considering the nature of the institutions, the nonideological character of the aid, the minimal surveillance required for enforcement of the prohibition against use of facilities for religious purposes, and the noninvolvement of the government in the day-to-day financial decisions of the institutions, no excessive involvement could be found. Hunt v. McNair also involved a case in which a record had been developed in the trial court. Looking at that record the Court reached the same conclusion as in Tilton v. Richardson. In Board of Education v. Allen, the Court said:

> We are unable to hold, based solely on judicial notice, that this statute results in unconstitutional involvement of the State. . . . 392 U.S. at 248, 88 S.Ct. at 1929.

From these cases it seem clear to us that a decision on the entanglement criterion will in most if not all cases require a factual inquiry rather than a resort to examination of the face of the statute in issue or to judicial notice about how it may be expected to operate. And as the Court makes clear in Hunt v. McNair, the burden of establishing the facts rests with the plaintiff challenging the expenditure.

■ The Rhode Island and Pennsylvania statutes considered in Lemon v. Kurtzman, *supra,* both involved payments either directly to religious schools or directly to teachers employed in such schools for teaching secular subjects. In the Rhode Island case it was found, and in the Pennsylvania case alleged, that the teacher salary supplements would be paid to teachers in schools in which an effort was made to create a pervasive religious atmosphere. The teachers were found, or alleged to be, under reli-

gious control or discipline. Religious hierarchical authority was found or alleged to pervade the school system. As Chief Justice Burger wrote with respect to Rhode Island:

> The teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith. These controls are not lessened by the fact that most of the lay teachers are of the Catholic faith. Inevitably some of the teacher's responsibilities hover on the border between secular and religious orientation. 403 U.S. at 618, 91 S.Ct. at 2114.

Because of these findings (Rhode Island) or allegations (Pennsylvania) about the nature of the schools and the character of the teachers, the direct subsidies for teacher salaries involved in Lemon v. Kurtzman presented for the states an acute problem in assuring that only secular and not religious instruction and activities was being supported. As Chief Justice Burger observed:

> A comprehensive, discriminating and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church. *Id.* at 619, 91 S.Ct. at 2114.

He also observed that the financial limitations of the Rhode Island program required that the state examine the school's records to determine how much of its total expenditures is attributable to secular education and how much to religious activity. He wrote:

> This kind of state inspection and evaluation of the religious content of a re-

court). Payments for predecision services and costs were permitted. *Id., aff'd,* 411 U.

S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

ligious organization is fraught with the sort of entanglement that the Constitution forbids. *Id.* at 620, 91 S.Ct. at 2115.

Contrasting Lemon v. Kurtzman with Board of Education v. Allen, Tilton v. Richardson and Hunt v. McNair, we conclude that a statute authorizing expenditures for education will be held to involve undue entanglement between government and religion if (a) it authorizes the payment of money or the furnishing of materials or facilities to a religious institution, and (b) the purpose of the payment or the nature of the materials or the facilities, and the character of the institution, are such that the government, in order to assure only secular use of the payment, materials or facilities, will be required to be involved in the internal operations of the institution, both religious and secular, on a continuing basis. But a statute authorizing expenditure for education will not be held to involve undue entanglement between government and religion even though it authorizes the payment of money or the furnishing of materials, equipment or facilities to a religious institution, if the expenditure is limited to secular uses and if from the character of the institution, the purpose of the payment and the nature of the materials or facilities, we find that it will not be necessary, in order to assure only secular use, for government to be involved in the internal operations of the institution, secular and religious, on a continuing basis. Application of the entanglement criterion, in short, requires a discrete analysis of each program to determine to what extent intrusion and surveillance will be required.

Justice Powell in *Nyquist* referred to "the Scylla and Charybdis of 'effect' and 'entanglement.'" 413 U.S. at 788, 93 S.Ct. at 2973. The Straits of Messina does, however, provide a channel for the careful seaman. We do not assume that the Court has made the arms of its primary effect test so long or the currents of its entanglement whirlpool so wide that it has forever frozen the permissible forms of governmental educational expenditure. The plaintiffs' position as to facial unconstitutionality of each of the four programs depends upon an opposite conclusion.

One additional factor must be taken into account. That factor is the constitutional status of the relationship between the Commonwealth, children, and parents. It is clear that the Commonwealth has an interest in the health and education of children that in many respects is superior to the interests of parents or the wishes of children. The compulsory school attendance law, Pa.Stat. tit. 24, § 13–1327, is a manifestation of that interest. So, too, are laws requiring medical and dental examinations, and other mandatory health programs. *E.g.,* Pa.Stat. tit. 24, §§ 14–1401 to 14–1422; *see* Law of March 10, 1949, P.L. 30, art. XII, § 1303 (repealed 1972) (smallpox vaccination). At the same time some liberty to choose in the matter of education has been recognized as constitutionally protected. *E.g.,* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Whether that liberty is a corollary of the free exercise clause of the first amendment or is one of the rights retained by the people to which the ninth amendment refers, or is one of those rights deemed fundamental but not the subject of an express guarantee, is of little moment. If the personal liberty of choice in education is constitutionally protected, the state must show a compelling state interest for restricting it, and the restriction may go no further in restricting it than is required for the protection of that interest. *See* Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *cf.* Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Aptheker

v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). Thus in legislating upon the education of children the state's choice of means for the achievement of its educational objectives is not restricted only by the establishment clause, and a court considering a constitutional challenge to a state's program must be mindful that the balance struck may be one as to which the alternatives for the achievement of those objectives are limited.

## B. APPLICATION OF STANDARDS

### 1. *The Auxiliary Services Program*

■■■ The Pennsylvania Department of Education has issued guidelines for the implementation of Act 194. From these guidelines (Exhibit P–1) and from the testimony of witnesses a clear picture of the operation of the act emerges. The Intermediate Units have been designated as the responsible agencies for providing services and assignment of staff for such services to nonpublic school children within the geographic boundaries of the respective Units. The program of any Intermediate Unit for providing auxiliary services is subject to periodic evaluation by the Department of Education. The services provided must conform to the School Laws of Pennsylvania, the Regulations of the State Board of Education and procedures of the Department of Education. The staff providing the services is employed by the Intermediate Units. Provision of services is defined as " . . . the delivery of auxiliary services requested by nonpublic school representatives, to children, through the providing of qualified personnel (whether through the use of staff members of the Intermediate Unit, or through the Intermediate Unit's contracting with other public agencies or individuals), and through the supplying of supportive materials, equipment, and personnel, necessary to the proper rendering of such services." (Exhibit P–1, § 1.3). The auxiliary services listed in Act 194 are defined in the guidelines as follows:

1.5 *Guidance, counseling, and testing* means (but is not limited to) such services as are delineated in Title 22, Pennsylvania Code, Section 7.13.

1.6 *Psychological services* shall mean those diagnostic and evaluative services for children, consultation and counseling with students, parents and members of the professional staff relative to understanding the dynamics existent in a student, class, or school.

1.7 *Exceptional children* shall mean "children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special education facilities or services." (Section 1371, School Laws of Pennsylvania)

1.8 *Services for exceptional children* means such educational and other services for exceptional children which are generally recognized to be of particular benefit to exceptional children enrolled in nonpublic schools.

1.9 *Remedial and therapeutic services* shall mean those corrective services applied following identification, including, but not limited to medical, psychological, and psychiatric as well as remedial measures.

1.10 *Speech and hearing services* shall mean those services provided to children whose speech or hearing deviates from accepted standards of their individual social and cultural community in such a way as to interfere with the communication process.

1.11 *Services for the improvement of the educationally disadvantaged* shall include but are not limited to those services necessary to assist a student to perform at the grade level for his age and potential.

Each of these services is rendered not as a part of the nonpublic school's general instructional program, but on an individualized basis to specific children determined to be in need of educational services beyond that available in a general instructional program. Nor is the program open ended. As both the statute and the guidelines make clear, only such auxiliary services are available as are provided for public school children.

The Commonwealth's interest in providing such individualized auxiliary services to children attending nonpublic schools is strikingly illustrated by the evidence with respect to speech and hearing services. Since 1949 the Commonwealth has required that every child of school age be given, at specified intervals, a hearing test by a school nurse or medical technician. Pa.Stat. tit. 24, § 14–1402(a)(2); see Law of March 10, 1949, P.L. 30, art. XIV, § 1422. A summary of the audiometric testing program in the School District of Philadelphia in the school year 1967–68 (Exhibit D–19) discloses:

| | Pupils Tested | Pupils Failed | % | Unable to Test * | % |
|---|---|---|---|---|---|
| Public | 108,139 | 5,319 | 4.7 | 164 | 0.2 |
| Parochial | 68,448 | 3,561 | 5.2 | 49 | 0.8 |
| Private | 2,356 | 107 | 4.2 | 10 | 0.4 |
| Martin School | 221 | 213 | 96.4 | 8 | 3.6 |
| Archbishop Ryan Memorial Institute | 66 | 54 | 81.8 | 12 | 18.2 |

There is no reason to believe that these results would be untypical of other Intermediate Units. P. D. Stopper, a speech therapist employed by the Carbon-Lehigh Intermediate Unit to render speech therapy services pursuant to Act 194 testified as follows:

Q Very well. As a professional speech therapist, is it your observation that there are many children who have speech problems?

A I think with that question I should answer it giving you what our professional journals say. The American Speech and Hearing Association publishes a journal or several of them and in that they have indicated that there are between five and up to ten per cent of the public school population that have speech problems. The reason I emphasize "public school" is because that's where the research was done.

Now, when I took this job, out of simple professional interest, I decided to find out what types or what percentages my schools had in relation to what my profession says there should be. In some schools I found it rather high. There was one up to 19 per cent which I thought was extreme. There was one around 15. There were several around 11 per cent. The average was above what the American Speech and Hearing Association said there should be, and I thought that was an interest of the profession.

Q What schools are they, public or non-public, to which you are referring now?

A I work in the non-public schools.

* Due to lack of comprehension

Q Now, therefore, you find that there are children who need speech therapy in both public and non-public schools?

A That is correct. I do find, though, that there is a greater need in the non-public schools, and the reason I say that is because it is almost like a frontier. There have not been services—well, there have—let's say there have been services, but they haven't been adequate in any way.

For instance, out of the children that I have seen screened in my schools, I have located approximately 350 children that could use speech therapy, but when I went into those schools, the only children that had been receiving speech therapy was the No. 17. There were 17 that were being taken from the parochial school into the public school to get their speech therapy.

Q To what do you attribute this lack of service, to what do you attribute the fact that only 17 had had the speech therapy?

A I have read what was published by my Intermediate Unit as the guidelines for accepting children from a parochial or non-public school into a public school speech program. That guideline said that it was up to the speech therapist's time and discretion whether to accept the children in their programs or not.

One of the problems there was, I think it was mentioned by the psychologist, transportation for one, but discretion of the speech therapist was also important, I found.

Q What do you mean by "the discretion of the speech therapist"?

A Well, if she could fit it into her case load, that was the major one, if she could fit it in, and if she al-ready had a full case load, many times the children were refused.

Q Was it your observation that she did or did not often have a full case load of public school children?

A I would say many times that she had a full one, but I would also say that there was one that I know of specifically who came in. She was a public school therapist. And she came in a half hour earlier to take some children from a parochial school. So it depended on the therapist. (Tr. 35–37)

Dr. D. A. Horowitz, Associate Superintendent for Schools For Special Services of the Philadelphia School District,[4] testified with respect to auxiliary services:

Q Are these auxiliary services under Act 194 part of the ordinary regular school curriculum or program?

A In the public or non-public schools, sir?

Q Well, in the non-public school?

A Are they? Generally not, to my best knowledge. They have existed in a rather spotty way and I say this only from second-hand information. (Tr. 45–46)

. . . . . .

Q Now, Mr. Horowitz, in your professional opinion, focusing now on services under Act 194, in your opinion, can such services be afforded non-public school children at public centers?

A At public schools?

Q Yes.

A No, I don't think so.

Q Why is that?

A Well, for many reasons, and depending on the specific, you know, item to which you are referring, where this equipment is being used, it is being fully utilized and cannot carry additional service or service time given to additional

---

4. Philadelphia is both a school district and an Intermediate Unit.

pupils who might come in plus the logistical problems of bringing in children or groups of children for a specific piece of an instructional program at a given time of the day and given weeks of the year. Logistically it just isn't possible. (Tr. 49)

Thus, taking hearing problems as an example, the Commonwealth was confronted with the reality that a very substantial number of nonpublic school children were suffering from untreated hearing deficiencies; deficiencies which are critical impediments to the entire learning process. The logistical problems of providing the services at public centers were at least formidable, if not insurmountable. The legislature chose to meet the problem by sending the therapists to the pupils. The same reality applied to the other learning auxiliary services listed in Act 194.

We hold that none of the specific auxiliary services listed in Act 194 has the primary effect of aiding religion. Each has the primary effect of meeting the state's primary objective of assuring that individual students receive those individualized services, outside the general program of instruction of their school, necessary for their individual progress in learning. It is true, of course, that a child with vision defects, provided glasses, will be enabled to read the Bible, as a child with hearing defects, provided a hearing aid, will be enabled to hear the word of God, and as an emotionally disturbed child, given psychological or medical therapy, may become receptive to religious training. But the benefit to religion in such instances is clearly secondary, and such secondary benefit exists no less for children attending public than for children attending nonpublic schools.

■ Plaintiffs focus, however, not so much on the specific auxiliary services listed in Act 194, but on the phrase ". . . such other secular, neutral, non-ideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth." This phrase, they suggest, makes the act so open ended that it will permit the Commonwealth to furnish teachers for the general instructional programs of the nonpublic schools. This, they urge, is prohibited by Lemon v. Kurtzman, supra. Lemon v. Kurtzman did not deal with public employees. But we need not here decide if that difference is critical. We do not believe Act 194 is subject to the open ended construction plaintiffs suggest. First, it was not written in a vacuum. The Intermediate Units were already providing auxiliary services to public schools, and these did not include furnishing teachers for the general instructional programs of the school districts. Second, the guidelines issued by the Pennsylvania Department of Education (Exhibit P-1) disclose no intention to apply Act 194 in an open ended manner. The guidelines suggest, rather, an ejusdem generis construction. Third, the plaintiffs have produced no evidence from which we could infer any likelihood of the open ended construction they suggest.

■ We note that John Jarvis, headmaster of Lancaster County Day School, a private nonsectarian school, testified:

Q And I show you this pamphlet marked D-24 which I have already identified. Would you hold that up to the members of the court and explain what that is and what services are available to you now that were not heretofore which were also available to the public schools in your area?

A Well, this has just been an opening up of certain opportunities for us that we really have not had before. There are a series of very excellent workshops being planned by Lancaster-Lebanon Intermediate Unit in which we are invited to participate. Not only are we invited, but secondly, we now would be able to apply under Act

194 for funds to cover the expenses of these workshops. (Tr. 85) It is not at all clear that Act 194 authorizes auxiliary services to teachers in the nature of continuing professional education. The guidelines of the Pennsylvania Department of Education do not mention programs for teachers. It is clear that Intermediate Units are authorized by another statute to provide such services to teachers in public schools. Pa. Stat. tit. 24, § 9–964. If Mr. Jarvis is correct that nonpublic school teachers will by virtue of Act 194 be admitted to the continuing professional education programs conducted by the Intermediate Units, we see no primary effect difficulty. The content of the programs obviously will be secular since they are entirely within the control of the Intermediate Units. Assistance to the religious mission of the sectarian schools is at least as remote and secondary in effect as when the Commonwealth permits potential teachers in such schools to attend its Commonwealth-supported universities.

 Plaintiffs urge that Act 194 fails the entanglement test because it provides ". . . such auxiliary services to be provided in their respective schools." The act does require contact between personnel of the Intermediate Units and personnel of sectarian schools. The Commonwealth, recognizing the logistical realities, provided for traveling therapists rather than traveling pupils. There is no evidence whatsoever that the presence of the therapists in the schools will involve them in the religious missions of the schools. The degree of interference by the Commonwealth in the general instructional mission of the religious schools would be greater, not less, if instead of sending therapists to the schools it required that pupils needing auxiliary services be dismissed from school and transported to public centers. The degree of contact between the religious teachers and the personnel of the Intermediate Units would be approximately the same. Unlike the programs considered in Lemon v. Kurtzman, *supra*, no continuing audit of the nonpublic schools' general instructional program or of their finances is necessary to insure that the services provided remain secular and nonideological. The notion that by setting foot inside a sectarian school a professional therapist or counselor will succumb to sectarianization of his or her professional work is not supported by any evidence. Pennsylvania has for many years sent public health nurses into nonpublic schools to carry out its mandatory student health program. Pa.Stat. tit. 24, § 14–1402. We are sure that if the professionals in this program had become tainted by religion, evidence of the taint would have been produced. The Intermediate Units will exercise the same controls over its professional employees serving nonpublic school children as they exercise over public school employees generally. This is not a case of potential interference with the general instructional program of a religious institution.

If Act 194 permits teachers from sectarian schools to attend continuing education workshops conducted by the Intermediate Units, we find no entanglement danger. The Intermediate Units may not conduct programs of instruction in religion. If admitted, religious teachers may attend or not, but their attendance will involve no actual or potential interference by the Commonwealth with the instructional program or the financing of religious institutions.

We find that Act 194, both facially and as thus far applied (1) does not have the primary effect of advancing religion, and (2) does not involve the Commonwealth in an impermissible entanglement with religion.

### 2. *The Textbook Loan Program*

 The textbook loan provisions of Act 195 are for first amendment purposes indistinguishable from the 1965 New York textbook loan statute upheld in Board of Education v. Allen, *supra*. Since 1885 Pennsylvania children attending public schools have been furnished

textbooks for use in those schools free of cost. Law of June 25, 1885, P.L. 173, § 1 (now Pa.Stat. tit. 24, § 8–801). The textbook loan provisions of Act 195 confer the same benefit on children attending nonpublic schools at which they can comply with the compulsory attendance law. The loan of textbooks under each statute is upon individual request. The textbooks, under each statute, must be books antecedently approved for use in the public schools. Under neither statute may religious texts be obtained, and the decision as to which texts qualify as secular, nonideological and neutral rests with the public authorities. The expenditure is for a clearly identifiable secular purpose. The only contact between the nonpublic schools and the Commonwealth authorities is the minimal contact involved in correspondence over processing the individual student book requests to those authorities, and in maintaining an inventory of the textbooks.[5] This contact in no way involves the Commonwealth with the religious mission of a school, with the content of its general program of instruction, or with its finances. The textbook loan program is controlled by Board of Education v. Allen, *supra*, and Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). We find that the textbook loan provisions of Act 195 both facially and as thus far applied (1) do not have the primary effect of advancing religion, and (2) do not involve the Commonwealth in an impermissible entanglement with religion.

3. *The Instructional Materials Loan Program*

The instructional materials loan program of Act 195 differs from the text-

book loan program (1) in the nature of the materials loaned, and (2) in the recipient of the loan. The guidelines of the Pennsylvania Department of Education provide:

*General Provisions*

3.1 Intermediate units are hereby designated as the responsible agencies for providing instructional materials . . . to children in the nonpublic schools within the geographic boundaries of the intermediate units Each intermediate unit shall comply with the appropriate procedures and regulations of the Department of Education and the appropriate sections of the Public School Code of Pennsylvania of 1949 as amended.

. . . . . .

*Program Operation*

3.9 The implementation of the Instructional Materials . . . portion of Act 195 of 1972 shall conform to the School Laws of Pennsylvania, Regulations of the State Board of Education, and procedures of the Department of Education.

. . . . . .

3.15 Purchasing of Instructional Materials

a. Each nonpublic school or the appropriate chief administrator shall submit a loan request on or before October 31 of the initial year and on or before March 15 thereafter for desired "Instructional Materials" not to exceed 80 percent of their total allocation for "Instructional Equipment" and "Instructional Materials" to the intermediate

5. The guidelines of the Pennsylvania Department of Education (Exhibit P–1) provide:
*Inventory*
4:10 "Textbooks" loaned to the nonpublic schools:
a. shall be maintained on an inventory by the nonpublic school.
b. and purchased by the Department of Education under Act 195 of 1972 shall be maintained on a statewide inventory by the Division of School Libraries.

4.11 It is presumed that textbooks on loan to nonpublic schools after a period of time will be lost, missing, obsolete or worn out. This information should be communicated to the Department of Education. After a period of six years, textbooks shall be declared unserviceable and the disposal of such shall be at the discretion of the Secretary of Education.

unit administering the provisions of Act 195.

b. The intermediate unit shall consolidate the loan requests and order the desired "Instructional Materials" in accordance with the Public School Code of Pennsylvania of 1949 as amended.

c. The intermediate unit shall develop a plan for inventory control.

3.16 Inventory of Instructional . . . Materials

a. Instructional materials loaned to the nonpublic schools shall be maintained on an inventory by both the nonpublic and the appropriate intermediate unit.

b. It is presumed that instructional materials on loan to nonpublic schools after a period of time will be lost, missing, obsolete or worn out. These items should be so noted on an annual inventory.

. . . . . .

d. Each nonpublic school shall submit to the local intermediate unit an inventory of all instructional materials . . . on loan on or before June 1 of each fiscal year. Each intermediate unit should submit to the Secretary of Education a composite inventory of all instructional materials . . . on loan, on or before June 30 of each fiscal year.

▪ To distinguish the primary effect of the instructional materials loan provisions from the textbook loan provisions we would be required to attach constitutional significance either to the difference between textbooks and such materials or to the fact that the schools rather than individual students became the bailees. As to the nature of the materials, there are no distinctions of constitutional significance between secular, neutral, nonideological textbooks, on the one hand, and secular, neutral, nonideological "books, periodicals, documents, pamphlets, photographs, reproductions, pictorial or graphic works, musical scores, maps, charts, globes, sound recordings, . . . processed slides, transparencies, films, filmstrips, kinescopes, and videotapes" on the other. If the public authorities can be trusted with selecting secular, neutral, nonideological textbooks for use by students in religious schools, they can be trusted to make the same judgment with respect to those instructional materials which in this nonsequential age have to some extent replaced textbooks as teaching media. As with textbooks, this statute is, from the point of view of primary effect, largely self-enforcing since by hypothesis the instructional materials will be the same as are made available in the public schools.

Nor can we attach constitutional significance to the fact that the schools, rather than individual students, become the bailees of the materials. No evidence has been presented from which we may infer that secular, neutral, nonideological instructional materials such as audio-visual materials, intended for group rather than individual use, are any more susceptible of diversion to a religious purpose than are textbooks. The expenditure is for a clearly identifiable secular purpose. The school is the custodian out of practical necessity because such materials are designed for group or multi-student use. Tilton v. Richardson, *supra*, and Hunt v. McNair, *supra*, teach that the religious institution's possession of the property granted under a school aid statute is not alone significant. No greater entanglement is required by the operation of the instructional materials loan program than by the textbook loan program. We find that the instructional materials loan provisions of Act 195 both facially and as thus far applied (1) do not have the primary effect of advancing religion and (2) do not involve the Commonwealth in an impermissible entanglement with religion.

4. *The Instructional Equipment Loan Program*

▪ Loans of instructional equipment are authorized by the same subsection of Act 195 as authorizes

loans of instructional materials. One obvious purpose of the equipment provision is to make useable that instructional material which for use requires equipment—slide projectors for slides, for example. But other equipment is authorized as well. As with textbooks and instructional materials, selection of the equipment is in the hands of Commonwealth authorities. Thus the equipment starts out quite clearly as secular in purpose. But while textbooks and instructional materials self-police, in that starting as secular, nonideological and neutral, they will not change in use, some equipment is not of the self-policing variety.

We can set to one side, and treat like instructional materials, equipment which from its nature is incapable of diversion to a religious purpose—laboratory equipment and gymnasium equipment, for example. Giving free rein to the imagination one could, perhaps, visualize a religious teacher storing holy water in a chemistry laboratory beaker, but as stated in Tilton v. Richardson, *supra*, 403 U.S. at 679, 91 S.Ct. at 2096:

> A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. . . . But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional.

Other equipment, however, like the buildings in Tilton v. Richardson, *supra*, and Hunt v. McNair, *supra*, is capable of diversion to sectarian purposes. A projector, for example, could be used to show a religious film. To the extent that Act 195 authorizes the loan of equipment capable of such diversion, a primary effect issue arises. We must look, then, at whether the Commonwealth has effectively restricted use of such equipment to secular purposes.

The guidelines of the Pennsylvania Department of Education (Exhibit P-1) provide:

3.14 Purchasing of Instructional Equipment

a. Each nonpublic school or the appropriate chief administrator shall submit a loan request on or before October 31 of the initial year and on or before March 15 thereafter for the desired instructional equipment not to exceed 80 per cent of the total allocation for "Instructional Materials" and "Instructional Equipment" to the designated intermediate unit in whose extended service area the nonpublic school is located.

b. The designated intermediate unit shall consolidate the loan requests and order the desired equipment in accordance with those sections of the Public School Code of Pennsylvania of 1949 as amended.

. . . . . .

3.16 Inventory of Instructional Equipment

. . . . . .

c. Instructional equipment loaned to nonpublic schools shall be maintained on an inventory by both nonpublic school and the appropriate intermediate unit. After a period of 10 years these items shall be declared unserviceable and the disposal of such shall be at the discretion of the Secretary of Education.

d. Each nonpublic school shall submit to the local intermediate unit an inventory of all instructional . . . equipment on loan on or before June 1 of each fiscal year. Each intermediate unit should submit to the Secretary of Education a composite inventory of all instructional . . . equipment on loan, on or before June 30 of each fiscal year.

In Tilton v. Richardson the statute, 20 U.S.C. § 751(a)(2), explicitly excluded a grant for any facility to be used for sectarian instruction or as a place for religious worship. The statute here is not quite so explicit. It refers to the equipment as "secular, neutral, non-ideological" and "presently or hereafter provided for public school children of the Commonwealth." But the Commonwealth defendants insist that properly construed and as construed by them, the statute means that "secular, neutral, non-ideological" applies not only to the nature of the equipment but also to its use. In Tilton v. Richardson the statute, 20 U.S.C. § 754(b)(2), provided that the United States could, if statutory restrictions as to use of the facility were violated "recover an amount equal to the proportion of the facility's present value that the federal grant bore to the original cost." 403 U.S. at 682, 91 S.Ct. at 2098. The statute here has no explicit provision for repossession of the loaned equipment, and no provision for recovery of its cost, if it is used for a religious purpose. Assuming, as the Commonwealth contends, that the statute properly construed permits recapture of the equipment if it is used for a religious purpose, a difficult surveillance problem remains as to which the Commonwealth has shown no simple solution. A slide or movie projector, television and broadcasting equipment, copying, printing and reproduction equipment may begin as neutral but can easily be adapted to a religious use. The key is predictability. Where, either from the statutory provisions or from the nature of the equipment, there is a means for the public officials to chart a lawful and administratively simple course, the loan may be constitutional. But where the equipment is not from its nature of the self-policing character, the Commonwealth may not, as the intervenors suggest, rely on the good faith of the bailees.

We find, then, that insofar as they permit the loan of instructional equipment which can be easily diverted to a religious use, the equipment loan provisions of Act 195, as applied, either have the primary effect of advancing religion or may involve the Commonwealth in an impermissible entanglement with religion. Insofar as the statute permits the loan of instructional equipment such as gymnasium equipment, laboratory equipment and the like which from its nature cannot be used for any but secular purposes, as applied Act 195 neither has the primary effect of advancing religion nor involves the Commonwealth in an impermissible entanglement with religion. The two categories of equipment are severable.

■ As a separate ground for their attack upon Acts 194 and 195 under the establishment clause the plaintiffs allege that each act "gives rise to and intensifies political fragmentation and divisiveness along religious lines." Complaint, para. 11. The plaintiffs introduced no evidence in support of this allegation. The defendants introduced the deposition of Carmen Bruto, a legislative correspondent of long experience, which contains his expert opinion that appropriations to carry out Acts 194 and 195 will not significantly involve legislative discussion of religion. We have no occasion to rely on that opinion. If plaintiffs' allegation is treated as one of fact, we hold that it simply has not been proven. Undoubtedly, however, what plaintiffs have in mind is a rule of law that any statute providing aid to nonpublic school children and requiring annual appropriations will be presumed to be politically divisive along religious lines. The potential for divisiveness in statutes providing for aid to nonpublic school children was touched upon in Lemon v. Kurtzman, 403 U.S. at 622, 91 S.Ct. 2105, 29 L.Ed.2d 745, and in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. at 797–98, 93 S.Ct. at 2978 where the Court said:

> [W]hile the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by decisions of this Court, it is cer-

tainly a "warning signal" not to be ignored.

We have given the statutes the careful scrutiny which the standards announced in the opinions of the Supreme Court require, and they have survived. In making that scrutiny we were aware of the potential for political divisiveness along religious lines from a decision either way on their constitutionality. We are not ready to assume, as the plaintiffs are, that an important social issue will become less divisive because an article III court has spoken upon it. The lessons of history are clearly to the contrary. The Court's pronouncement on school prayer, School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), for example, is still the subject of heated debate. See, e.g., N.Y. Times, Sept. 25, 1973, § 1, at 34, cols. 1–2. The divisiveness of the issues decided in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has continued unabated since the Court's pronouncement. Those issues continued to boil and fester under Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), for fifty-eight years until the Court reversed that decision. The nature of the issues involved in the whole area of choice in education are so complex and controversial that no pronouncement by a court will make them somehow go away.

## VII. THE FREE EXERCISE COUNT

We held in discussing standing that as this complaint is drafted only the individual plaintiffs have standing to assert an interference with the free exercise of their religion. Of these, only plaintiff Meek testified. It was stipulated that the testimony of Weatherley would be the same. Since the free exercise claim was put in issue by the defendants there is a failure of proof as to all plaintiffs other than Meek and Weatherley. As to them, we find from her testimony that their objection to the Commonwealth's program is essentially political and social rather than religious, and that the impact of whatever miniscule burden of taxation which results to them from the expenditures in question has no effect upon the free exercise of their religion. See Tilton v. Richardson, supra, 403 U.S. at 689, 91 S.Ct. 2091; cf. Board of Education v. Allen, supra, 392 U.S. at 248–249, 88 S.Ct. 1923. Since we find that their objection to the programs is essentially political and social rather than religious there is no occasion to pass upon the issue whether a plaintiff has standing to challenge a governmental expenditure on free exercise rather than on establishment grounds. Compare Wisconsin v. Yoder, supra; Murdock v. Pennsylvania, supra.

## VIII. CONCLUSION

The plaintiffs' application for a preliminary and a final injunction against the expenditure of Commonwealth funds pursuant to Act 194 will be denied. The plaintiffs' application for a preliminary and final injunction against the expenditure of Commonwealth funds pursuant to Act 195 will be granted to the extent that the Commonwealth defendants will be enjoined from loaning instructional equipment which from its nature can be diverted to religious purposes. The parties shall meet with Judge Bechtle on Monday, February 25, 1974 at 9:30 A.M. in Room 2106, United States Courthouse, Philadelphia, Pennsylvania for a conference at which he will receive suggestions as to the precise provisions of the injunction. If the parties are unable to agree on the form of an injunction, a hearing as to scope of relief will be held before this three-judge court on a prompt date to be fixed.

HIGGINBOTHAM, District Judge (concurring in part and dissenting in part).

### I.

#### Introduction

Seven decades ago, Mr. Justice Holmes reminded us that:

"Great cases, like hard cases, make bad law. For great cases are called

great, not by reason of their real importance in shaping the law of the future, but because of some accident of *immediate overwhelming interest which appeals to the feelings and distorts the judgment*. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." [Dissenting Opinion in Northern Securities Company v. United States, 193 U.S. 197, 400–401, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904)] (Emphasis added.)

The current financial hardships, the plight and in fact the possible survival of many of Pennsylvania's nonpublic schools make the instant matter both a "great" and a "hard" case. Certainly, there is a tugging appeal to one's humanitarian feelings and interest over the difficulties which will confront nonpublic schools if these appropriations are constitutionally precluded,[1] and one is mindful that, unfortunately, the financial crisis is perhaps most crucial to the Roman Catholic parochial schools which have contributed so much in educating so many at such relatively low costs.[2] I am not unaware of the grave concern that more public funds would have to be spent if nonpublic schools were closed thereby transferring the educational burden almost totally to the public arena; however, for me the constitutional test is not one of fiscal load, since the argument on fiscal grounds embraces the type of interest which in the words of Justice Holmes could appeal to the feelings and distort the constitutional judgment.[3]

1. While the instant record does not contain as original documents much economic data on the precise impact of the termination of the economic assistance in issue to students attending nonpublic schools, counsel for intervenor, Springfield, has included a copy of the brief filed by Henry E. Crouter in Crouter v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973). In that latter brief, President Nixon is quoted as having said:
". . . In the past two years, close to a thousand nonpublic elementary and secondary schools closed and most of their displaced students enrolled in local public schools.
"If most or all private schools were to close or turn public, the added burden on public funds by the end of the 1970's would exceed $4 billion per year in operations, with an estimated $5 billion more needed for facilities." Report to the Congress of March 3, 1970 on Education Reform. Crouter brief at 59.
Theodore R. Sizer, Dean of the Harvard Graduate School of Education, has said:
"How to finance this necessary and responsible increased cost? In my judgment the average independent school would not be able to increase its income the requisite amount and still hold tuition down low enough to provide for a varied student body. The only recourse is public funds . . . ." Crouter brief at 56.

2. The Report of the Archdiocesan Advisory Committee on the Financial Crisis of Catholic Schools in Philadelphia and Surrounding Counties (Abridged Edition 1972) notes that in fiscal 1970 elementary schools in the Archdiocese of Philadelphia incurred debts of $193,000, while high schools spent $804,000 more than available revenues.
"A. . . . The combined school operation deficit for 1970 was, therefore, $997 thousand. Thus, the total deficit for 1970 incurred by the three operations—parish churches, elementary schools and diocesan high schools—was $2.2 million. During fiscal 1971, the deficit in parish operations alone jumped to $5.1 million, a four-fold increase over 1970. Although complete school financial data is not yet available for 1971, there is every probability that the total deficit will increase, due mainly to the elimination of state aid.
"B. Deficits will continue and will grow during the next several years. Projections covering the school years 1972–73 (fiscal '73) to 1974–75 (fiscal '75) indicate that by 1975 the cumulative deficit in the schools will reach $55.4 million. That projection represents the deficit resulting from a concatenation of most probable conditions. The deficit could be as high as $84.1 million, or a low of $43.1 million." Id. at 9.

3. See as an example Legislative Finding 4 of the Pennsylvania Act under attack in Crouter v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973):
"(4) Should parents of children now enrolled in nonpublic schools be forced by economic circumstances to transfer any substantial number of their children to public schools, an enormous added finan-

But today, just as when the First Amendment was written almost two centuries ago, we must be vigilant to not let the "immediate interest" at hand cause the federal courts to bend or deviate from the well-settled principles of law embraced within the boundaries of the Establishment and Free Exercise Clauses of the First Amendment. It is now too late in the day to move backwards the hands of our forefathers' constitutional clock.

Thus, I concur with the majority of the Court today only insofar as they uphold the provisions of Act 195 pertaining to the loaning of secular textbooks to the nonpublic school pupils. Furthermore, I concur with the majority opinion's conclusion that those portions of Act 195 which authorize the loaning of projection equipment and recording equipment must be invalidated, but I respectfully dissent from the Court's conclusion that equipment of that nature can be severed from the overall instructional equipment loan program and otherwise approved. Reiterating my position, I believe only the loaning of secular textbooks can be constitutionally permitted under the First Amendment, and the remaining aid programs, including the auxiliary services program of Act 194, the instructional materials program of Act 195, and the instructional equipment program of Act 195 must be stricken down *in toto* and be held unconstitutional.

In many respects, this case vividly illustrates and typifies the unswerving persistence and perseverance of state legislatures throughout the nation in continually seeking to alleviate the increasing financial plight and monetary strain of nonpublic secondary and elementary schools. Each successive legislative scheme, heeding the sage admonitions reflected in the growing number of Supreme Court pronouncements, becomes inevitably more sophisticated and refined as it endeavours to approach as close as feasible to the "verge" [4] of the constitutional precipice and yet not overstep the boundaries of the Establishment and Free Exercise Clauses of the First Amendment. Recognizing that "we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law," Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (Burger, Ch.J.), it is my judgment that, adhering to the constitutional standards and guidelines announced heretofore, the only component of Acts 194 and 195 which substantially complies· with the First Amendment strictures is the loaning of secular textbooks to nonpublic school pupils.

The majority of the Court has today adopted a position that in my view exalts form over substance, ignoring and obscuring a fundamental reality that the subsidizing and sponsorship of secular education in nonpublic secondary and elementary schools ineluctably will eventuate in spawning the fostering and promotion of religion violative of the Establishment Clause of the First Amendment. The constitutional guarantees traditionally subsumed under and secured by the Establishment Clause have today unquestionably been seriously if

---

cial, educational and administrative burden would be placed upon the public schools and upon the taxpayers of the State. Without allowance for inflationary increase, the annual operating cost of educating in public schools the five hundred thousand students now enrolled in Pennsylvania nonpublic schools would be an additional four hundred million dollars ($400,000,000). Necessarily added capital costs to construct new facilities or acquire existing facilities would be in excess of one billion dollars ($1,000,000,000). Any

substantial portion of these operating and capital costs would be an intolerable public burden and present standards of public education would be seriously jeopardized. Therefore, parents who maintain students in·nonpublic schools provide a vital service to the Commonwealth."

4. The "verge" language was first penned by Justice Black in Everson v. Board of Education of Ewing Tp., 330 U.S. 1, 16 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947).

not irreparably eroded and eviscerated. As a likely aftermath of the Court's affixing its imprimatur to this legislation, one can forecast dire portents for Church-State relations. Most assuredly, this action will not go unnoticed in other states whose steadfast hopes of being able to financially assist nonpublic schools have still not been dashed and who remain undaunted and confident that they ultimately will prevail.

I recognize that my most able and distinguished colleagues speak with equal sincerity and conviction for the views which they have espoused in the majority opinion. Yet, with all due respect and esteem I feel that I would be utterly remiss (from my perspective of the constitution) if I did not register my firmest protest against what I regard as a perilous departure from the teachings of the First Amendment. The instant decision is not merely a latent, minute crack in the constitutional bulwark; instead it smashes the constitutional floodgates. It sanctions the potential inundation of ominous policies which could leave the constitution a mere shell of what the Founding Fathers envisioned and it creates dangers which the founders so fervently and zealously sought to avoid.[4a]

The First Amendment as it assures freedom of religion and prohibits governmental establishment of religion, comes almost directly and primarily from the authorship of James Madison and his prior efforts in writing A Bill For Establishing Religious Freedom as finally enacted by the General Assembly of Virginia on January 19, 1786. In pointed language that provision noted:

"Well aware that Almighty God hath created the mind free; * * * that

*to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical*;

"We, the General Assembly, do enact, That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, retrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief." (Emphasis added)

We have clearly turned the constitutional clock backwards here. Madison, as author of the First Amendment, was concerned that not even a "three pence" contribution be exacted from any citizen in the aid or establishment of a religion. (See third paragraph of Memorial and Remonstrance Against Religious Assessments). Here the majority sanctions almost seventy million dollars exacted from taxpayers in one state. Tragically, there is no suggestion that the end to this escalating magnitude is ever in sight if sophisticated nomenclature and adroit bookkeeping mechanisms are used.

## II.

*Relevant Financial and Religious Characteristics of Acts 194 and 195*

Before focusing on the constitutional questions the financial dimensions of this legislation should be highlighted, particularly noting and emphasizing the sectarian and denominational affiliations of most of the recipients of these governmental subsidies. In administering Acts 194 and 195 the Commonwealth has adopted the position that it will *not* inquire about the religious characteristics

---

4a. For a history of the First Amendment and its constraints, see Everson v. Board of Education of Ewing Tp., 330 U.S. 1, 28–63, 67 S.Ct. 504, 517–535, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting), and the references cited therein; Memorial and Remonstrance Against Religious Assessments, II Writings of James Madison 183–191 (Hunt ed. 1901); Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 212–232, 68 S.Ct. 461, 466–475, 92 L.Ed. 649 (1948) (Frankfurter,

J., concurring). See also Note, Sectarian Books, the Supreme Court and the Establishment Clause, 79 Yale L.J. 111, 131–139 (1969); Freund, Public Aid to Parochial Schools, 82 Harv.L.Rev. 1680 (1969); Pfeffer, Church, State, and Freedom (rev. ed. 1967). For general historical references see Emerson, Haber & Dorsen, Political and Civil Rights in the United States, Vol. 1 at 741–744 (1967).

of the nonpublic schools requesting monies provided in accordance with this legislation. The only criterion apparently imposed in determining eligibility is that the nonpublic school complies with and fulfills the Commonwealth's compulsory school attendance requirements. Thus even if a nonpublic school maintains religious restrictions on pupil admissions, that school would not be precluded from participating in the programs challenged here. Along the same lines, Robert J. Czekoski, Coordinator of Nonpublic School Services and the chief administrator of Acts 194 and 195, testified at the final hearing on plaintiffs' application for a preliminary injunction that it was of no relevance in implementing the programs and thus the Commonwealth would not inquire whether any school compelled attendance for instruction in theology and religious doctrine or required participation in religious worship. Nor would the Commonwealth question if the nonpublic school was an integral part of the religious mission of the sponsoring church, has as a substantial or dominant purpose the inculcation of religious values, imposes religious restrictions on faculty appointments, or attaches religious restrictions on what the faculty might teach. (See generally N.T. of September 10, 1973 at 8–18 particularly 13–17.)

In answers to interrogatories propounded by the plaintiffs it was ascertained that of the 1,320 nonpublic schools in the Commonwealth which comply with the compulsory attendance laws, at least 986 or roughly 75 per cent were Roman Catholic Diocesan schools. To further clarify those statistics, the aggregate number of individuals attending nonpublic schools was 453,699, but 400,932 or approximately 88 per cent

represented pupils attending Roman Catholic Diocesan schools. The record does not provide a more specific religious delineation for the remaining nonpublic schools.[5]

For the 1972–1973 school year the Commonwealth budgeted $14,280,000.00 for the implementation of Act 194 and $16,660,000.00 for Act 195. The respective figures appropriated for the 1973–1974 school term are $17,880,000.00 and $17,560,000.00. Under Act 195, during the 1972–1973 school year $4,670,000.00 of the sum budgeted for that year had been expended for the acquisition of textbooks for loan to nonpublic school children.

At least two observations can be readily gleaned from the foregoing statistics: First, the sums allocated by the Commonwealth for the implementation of Acts 194 and 195 can by no means be regarded as insubstantial or insignificant. Secondly, nonpublic schools having a recognized and dominant sectarian character are the primary and principal beneficiaries of the legislative enactments. The presence of the latter feature has notably contributed to several courts ruling that statutes of this nature were essentially class legislation and thus constitutionally suspect under the First Amendment. See, e. g., Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 2986, 37 L.Ed.2d 939 (1973); Public Funds for Public Schools of N. J. v. Marburger, 358 F.Supp. 29, 33–36 (D. N.J.1973); Wolman v. Essex, 342 F. Supp. 399, 412 (S.D.Ohio 1972), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972); Kosydar v. Wolman, 353 F. Supp. 744, 753–755 (S.D.Ohio 1972), aff'd sub nom., Grit v. Wolman, 413 U. S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1973).

5. Significantly, one should bear in mind that the predominant concentration of Catholic schools which will receive aid under these Acts does not fully account for or document the degree of participation or involvement of other sectarian, e. g., Lutheran, Jewish, Presbyterian, or Episcopalian schools. Thus if the entire statistical universe of all sectarian schools in the Commonwealth were included, it necessarily would reflect a high-

er percentage of the nonpublic schools being religiously identified or integrally connected with sectarian organizations. Cf. Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 2985–2986, 37 L.Ed.2d 939 (1973) and Lemon v. Kurtzman, 403 U.S. 602, 610, 91 S.Ct. 2105, 2110, 29 L.Ed.2d 745 (1971), where the Court found that more than 96 per cent of the nonpublic schools in the Commonwealth were church-related.

## III.

### Act 195 and the Secular Textbook Loan Program

The providing of secular textbooks to nonpublic school children under Act 195, 24 P.S. § 9–972, is the one section of these two acts which might best withstand a First Amendment attack and pass constitutional muster. One of my reservations about this program, and generally for that matter a fatal reservation regarding the other three programs, pertains to the wording of the statute itself as it is particularly embodied and expressed in its legislative findings and declaration of legislative policy. The legislative drafting accentuates the special class appearance which permeates the entire statutory framework.

Everson v. Board of Education of Ewing Tp., 330 U.S. 1, 67 S.Ct. 504, 91 L. Ed. 711 (1947) and Board of Education of Cent. Sch. Dist. No. 1. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) are the two authorities enunciating the relevant criteria most apposite here.[6] In *Everson* the Court found it to be constitutionally permissible for the state to offer free access to public transportation to and from school for all school children, including those in attendance at nonpublic schools. The *Allen* ruling extended *Everson* to immunize the loaning of secular textbooks to all children throughout the state for designated grades, encompassing both nonpublic and public school children. For each statute there was no question that the general benefits provided thereunder would inure to all the children in the state, thus avoiding any inference that a certain class had been singled out to receive state aid.

The *Everson* statute specifically stated:

"Whenever in any district there are children living remote from any schoolhouse, the board of education of the district may make rules and contracts for the transportation of such children to and from school, including the transportation of school children to and from school other than a public school, except such school as is operated for profit in whole or in part.

"When any school district provides any transportation for public school children to and from school, transportation from any point in such established school route to any other point in such established school route shall be supplied to school children residing in such school district in going to and from school other than a public school, except such school as is operated for profit in whole or in part." 330 U.S. at 3, 67 S.Ct. at 505 n.1.

The text of the *Allen* statute substantially tracked the wording of *Everson*:

"In the several cities and school districts of the state, boards of education, trustees of such body or officers as perform the function of such boards shall have the power and duty to purchase and to loan upon individual request, to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law, textbooks. Textbooks loaned to children enrolled in grades seven to twelve of said private schools shall be textbooks which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities. Such textbooks are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by the board of regents and such boards of education, trustees or other school authorities." 392 U.S. at 239, 88 S.Ct. at 1924 n.3.

---

6. Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930), was not decided on First Amendment grounds, but rather was bottomed on a finding that neither Section 4 of Article IV of the United States Constitution, guaranteeing to every state a republican form of government, nor the Fourteenth Amendment forbidding an unconstitutional taking of property for private use, had been violated when free books were provided by the state to all school children.

Juxtaposing Act 195, 24 P.S. § 9–972(a), under attack here to the *Everson* and *Allen* statutes, one can contrast the legislative drafting technique employed:

"9–972. Loan of textbooks, instructional materials and equipment, nonpublic school children.

"(a) Legislative Findings: Declaration of Policy.

The welfare of the Commonwealth requires that the present and future generations of school age children be assured ample opportunity to develop to the fullest their intellectual capacities. To further this objective, the Commonwealth provides, through tax funds of the Commonwealth, textbooks and instrumental materials free of charge to children attending public schools within the Commonwealth. Approximately one-quarter of all children in the Commonwealth, in compliance with the compulsory attendance provisions of this act, attend nonpublic schools. Although their parents are taxpayers of the Commonwealth, these children do not receive textbooks or instructional materials from the Commonwealth. It is the intent of the General Assembly by this enactment to assure such a distribution of such educational aids that every school child in the Commonwealth will equitably share in the benefits thereof."

Though the intent of the legislature in each instance was obviously and undoubtedly identical, that is, to extend some basic secular services to all children irrespective of the school attended, the Pennsylvania statute is more susceptible to a constitutional challenge than its predecessors. *See also Marburger, supra,* 358 F.Supp. at 35–36 and other cases cited on page 666 *supra.*

A more troublesome aspect of this program is the potential for excessive entanglement of Church and State. Lemon v. Kurtzman, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) articulated the three-prong test courts should follow in analyzing the multifarious legislative schemes adopted.

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' Walz, supra, at 674, 90 S.Ct. at 1414."

The plaintiffs concede that the Acts 194 and 195 evince a secular legislative purpose. Passing over for the moment the second requirement that the statute not be such that its primary or principal effect either advances or inhibits religion, I will consider the third criterion commanding that there be no excessive entanglement of the government and religion.

The Court's decision to consolidate the hearing on plaintiffs' motion for a preliminary injunction pursuant to Fed.R. Civ.P. 65(a)(2) necessitates that any analysis should not be restricted solely to facial unconstitutionality but additionally should examine whether the application, implementation, or construction of the statute is constitutionally repugnant.

In the case at bar the Commonwealth has promulgated "Guidelines for the Administration of Acts 194 and 195," and therefore I can scrutinize the regulations in conjunction with the statutes. *Allen* preceded Walz v. Tax Commission of City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) and thus the entanglement requirement introduced in *Walz* was not directly raised or considered in *Allen*. Lemon v. Kurtzman, 403 U.S. at 613–614, 91 S.Ct. at 2111–2112, held constitutionally infirm a Pennsylvania statute on the ground of excessive entanglement without reaching whether the scheme was equally violative under the "effect" test. On the other hand, the Court struck down the Pennsylvania and New York statutes on the primary effect bar in Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. at 2982 n. 8, 37 L.Ed.2d 939; Committee for Public

Ed. & Religious Lib. v. Nyquist, 413 U. S. 756, 93 S.Ct. 2955, 2969, 37 L.Ed.2d 948 (1973), and Levitt v. Committee for Public Ed. & Religious Lib., 413 U.S. 472, 93 S.Ct. 2814, 2818–2820, 37 L.Ed. 2d 736 (1973).

Unlike the regulations upheld by the Court in *Allen*, the administrative regulations of the Commonwealth are much more intrusive, cumbersome and detailed, bringing the Commonwealth into frequent association with the nonpublic schools. Though the Court there did not invalidate the administrative procedure utilized by the state notwithstanding the intermediate intervention of the nonpublic schools, the operation in the instant case extends beyond the practice permitted then. The legislative approach in *Allen* was found not to be constitutionally flawed even though the individual pupil requests for secular books were filed initially with the nonpublic school and the nonpublic school would prepare summaries forwarding those to the Board of Education. 392 U.S. at 244, 88 S.Ct. at 1926–1927 n. 6. Storing the textbooks on the premises of the nonpublic schools was similarly constitutionally tolerated.

Section 4 of the Commonwealth's Guidelines explicates the operative procedures the nonpublic schools and their pupils should follow to receive the books made available through Act 195. Sections 4.3, 4.4, 4.6, 4.7, 4.9, 4.10, 4.11, and 4.13 of the Guidelines, set forth below, point out some of the entanglement features of the Act.

Sections 4.3 and 4.6 provide:

"4.3 Each nonpublic school shall submit on or before October 15 for the initial year and on or before March 1 thereafter a loan request for the desired textbooks to the Department of Education. The requests will be of standard format and will be distributed by the Department of Education prior to October 1 of the initial year and on or before February 15 of each year thereafter, to each nonpublic school or the appropriate chief administrator. The request shall not exceed 80 per cent of the total allocation." [7]

"4.6 Textbooks requested will be shipped directly to the appropriate nonpublic school."

Exhibit D–9,[8] printed in the footnote, is the form prepared by the Department of Education which students should complete for the books. Evidently the De-

---

7. Section 4.3 of the Guidelines was revised by the Secretary of Education in March 1973, and now reads:
 "Each nonpublic school shall submit on or before May 15 for the 1973–74 school year and on or before March 1 thereafter a loan request for the desired 'textbooks' to the Department of Education. The requests will be of standard format and will be distributed by the Department of Education prior to April 15 for 1973–74 school year and on or before February 15 of each year thereafter, to each nonpublic school or the appropriate chief administrator. The request shall not exceed 80 per cent of the total allocation."

8. Exhibit D–9 provides:
 "TO: SECRETARY OF EDUCATION
 COMMONWEALTH OF PENNSYLVANIA

 CERTIFICATE OF INDIVIDUAL REQUEST FOR LOAN OF TEXTBOOKS

 "I hereby request the loan of textbooks and instructional materials in accordance with Pennsylvania Act of 195–1972 for my child(ren) attending

 _____
 (School) (City) (Zip)

 "Date: _____ (Signed) _____
 (Parent or Guardian)

 "N.B. This law is applicable to Pennsylvania residents attending schools in Pennsylvania only."

partment of Education sends the forms directly to the nonpublic schools, the schools in turn forward them to the parents who fill them out and return them not to the Secretary of Education, thus contrary to what the forms connote, but rather to the school from which they received the forms.[9]

Therefore, as in *Allen,* and as stated in Section 4.3 of the Commonwealth's Guidelines, the nonpublic school totals the number of individual requests and transmits this figure to the Department of Education. According to Section 4.6, the books are then transported not to the children but to the nonpublic schools which distribute them to the children.[10] Thus, to a limited degree this resembles the procedure which was approved in *Allen* on a record, I might add, which was far more exiguous than that presented to this Court.

The *Allen* procedure however has been further distended in the instant case. Section 4.4 of the Guidelines provides:

"Five per cent should be allowed in the purchase request for transportation allowances."

Section 4.7 states:

"The Department of Education is responsible for fiscal control, fund accounting and maintaining records for the acquisition of the textbooks."

While Section 4.7 suggests that the accounting operations would be centralized, entailing minimal contact with the nonpublic schools and thus not necessitating the "comprehensive, discriminating and continuing state surveillance" condemned in Lemon v. Kurtzman, 403 U.S. at 619, 91 S.Ct. at 2114, other sections of the Guidelines negate any contention that the Commonwealth's administrative intrusion would only be slight, infrequent or occasional.

Section 4.9 admonishes:

"Each nonpublic school shall be responsible for any expenditures in excess of its allocations."

A reading of Sections 4.10 and 4.11 re-emphasizes the legislative drafting shortcomings. Section 4.10 states in relevant part:

"Textbooks *loaned to the nonpublic schools:* (a) shall be maintained on an inventory by the nonpublic school." (Emphasis added.)

Section 4.11 provides:

"It is presumed that textbooks on *loan to nonpublic schools* after a period of time will be lost, missing, obsolete or worn out. This information should be communicated to the Department of Education. After a period of six years, textbooks shall be declared unserviceable and the disposal of such shall be at the discretion of the Secretary of Education." (Emphasis added.)

Viewing the regulations as *in pari materia* and integral components of Act 195, serious questions are raised in my mind as to whether the books are in fact loaned directly to the children as in *Al-*

9. Exhibit D–17 is the text of a letter mailed by one sectarian school principal to parents of children enrolled in that nonpublic school. There is nothing in the record to discredit the second paragraph of the letter and as a matter of practice this probably would be the manner in which the book transfer process operates.

"Dear Parent:

"Pennsylvania law, Act 195, November 1972, provides for the loan of some textbooks and instructional materials to students of nonpublic schools. We are, therefore, happy to be able to extend to you a credit of $9.70 per student toward the purchase of textbooks; the instructional materials will be made available in the classroom. This credit will be deducted from the student's book bill in September.

"Please sign the enclosed card and *return to the school as soon as possible.* Your prompt cooperation in this matter will be appreciated. (Emphasis added.)

Very truly yours,"

10. It is not clear from Allen whether, once the figure indicating the number of books needed had been computed and conveyed to the Board of Education, the books were sent directly to the children or to the school. The fact that the books could be kept on the premises suggests that the books were shipped to the schools.

*len* or really if this portion of the Act is merely nothing more than an elaborately contrived subterfuge designed to principally aid nonpublic schools which are fundamentally and preponderantly church-related.[11]

A final example of potentially hazardous entanglement of Church and State is Section 4.13 of the Guidelines:

> "The nonpublic school or the agency which it is a member shall be responsible for maintaining on file certificates of requests from parents of children for all textbook materials loaned to them under this act. The file must be open to inspection for the appropriate authority. A letter certifying the certificates on file shall accompany all loan requests."

Upon considering (1) the special class nature of the legislation, (2) the excessive administrative entanglement features of the Act, and (3) the potential that the Act serves as a boon to nonpublic schools because of the primary aid which could be diverted for sectarian functions unless there was strict compliance by the nonpublic school administrators, I am not completely free from doubt as to the constitutionality of even this provision which allocates secular books by the Commonwealth to children enrolled in nonpublic schools. Certainly, defendants have not patently established the constitutionality of this provision. Yet, despite my almost agonizing doubts on this extremely close question, I resolve the issue of constitutionality in favor of the provision of the statute which loans secular books to students at non-

public schools. But in making this resolution I must note that by the barest scintilla possible the book provision avoids intrusion into the zone of unconstitutionality.

## IV.

### *Act 194 and the Auxiliary Services Program*

Turning to Act 194, the authority mandating the provision of auxiliary services for nonpublic school children, the Court is confronted with a novel and intriguing legislative scheme enabling nonpublic schools to receive some secular services from the Commonwealth. While I reluctantly concur with the majority as respects the loaning of secular textbooks, I am unable to arrive at the same conclusion for the auxiliary services, the instructional equipment or the instructional materials. The approbation of this approach can produce far-reaching, sweeping, and monumental consequences for Church-State relations, for at bottom the seminal question presented is whether a state can achieve in an indirect, circumlocutious fashion what it is constitutionally barred from doing directly. Phrased differently, can the Commonwealth of Pennsylvania via Intermediate Units, which are duly authorized state agencies, circumvent the First Amendment restraints which historically have been engrained and implanted in the constitutional matrix of this country? I earnestly do not believe so.

First, the program of auxiliary services is plagued by the same legislative

---

11. In Allen, the Court additionally observed that parents of nonpublic school children had presumably been required to purchase textbooks. According to the Commonwealth's proposed pretrial order, nonpublic school children prior to Act 195 similarly had to purchase their own textbooks. The record in this case however does not disclose whether separate book fees were charged by the school to which the parents under Act 195 could now expect a pro-rata deduction or if parents paid a fixed tuition for their children at nonpublic schools and this tuition encompassed any and all school expenses at-

tendant to enrolling in that school. There is nothing in the Act 195 compelling the nonpublic schools to credit the parent's account and not use the money formerly allocated for secular books for other purposes. *Cf.* Nyquist, *supra*, 413 U.S. 756, 93 S.Ct. at 2969. "In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and non-ideological purposes, it is clear from our cases that direct aid in whatever form is invalid." See also 413 U.S. 756, 93 S.Ct. at 2970–2971.

drafting defect alluded to in the previous discussion of the loaning of secular textbooks. In essence the special class of sectarian schools has been isolated for receipt of state supportive services.

Secondly, the plaintiffs' position in regard to the auxiliary services should be stated here:

"We [the plaintiffs] do not challenge the right of parochial school children to obtain the auxiliary services provided by the statutes or the constitutional authority of the Commonwealth to provide those services to them. We challenge only the power to supply the services on church-owned and church-controlled premises as part of the program of parochial school education under church sponsorship. We recognize that requiring the children to come to publicly controlled neutral premises to receive publicly administered services may be less convenient than the form of administration authorized by the statutes. But, this is no less true with respect to any of the numerous forms of aid that the Supreme Court has ruled unconstitutional." Plaintiffs' Supplemental Brief at 2.

In contrast to Act 195 and the loaning of textbooks, (1) these auxiliary services are being provided on the premises of the nonpublic schools and (2) teachers, unlike textbooks, are not fungible, the former not being inanimate objects totally devoid of emotions, feelings or opinions. Nor can it be gainsaid that the Intermediate Unit is any less an organ of the Commonwealth, and thus it is subject to the same constitutional proscriptions incumbent on the state.

The Commonwealth's plan calls for the Intermediate Unit to hire these teachers rather than the nonpublic schools, and the teachers are of course accountable to the Intermediate Unit for their professional conduct and the conscientious performance of their duties. But these precautionary measures still cannot permit one to inescapably avoid the conclusion that some assurance must be made that when these teachers are thrust into a religious environment, their secular functions do not become inextricably entwined with the sectarian character of the school.

In Earley v. DiCenso, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) the Court repudiated Rhode Island's attempt to supplement the salaries of teachers of secular subjects in nonpublic schools. The Court rejected the argument that teachers would not mix religion with the secular subjects which they were charged with teaching:

"We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faiths are not inculcated or advanced by neutrals. With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine. * * * Further difficulties are inherent in the combination of religious discipline and the possibility of disagreement between teacher and religious authorities over the meaning of the statutory restrictions.

"We do not assume, however, that parochial school teachers will be unsuccessful in their attempts to segregate their religious beliefs from their secular educational responsibilities. But the potential for impermissible fostering of religion is present. The Rhode Island Legislature has not, and could not, provide state aid on the basis of a mere assumption that secular teachings under religious discipline can avoid conflicts. The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion. . . .

\* \* \* \* \* \*

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed. \* \* \* *Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment.* These prophylactic contacts will involve excessive and enduring entanglement between state and church." 403 U.S. at 618–619, 91 S.Ct. at 2114. (Emphasis added.)

No more or less is expected and demanded of the Commonwealth in the instant case. While the Commonwealth's procedure is probably more restricted and less disturbing than that present in *DiCenso, supra,* some state surveillance must be maintained and that intrusion

in my view would require excessive embroilment of Church and State violative of the Establishment Clause of the First Amendment. Moreover, I do not believe that the Commonwealth's complacent reliance upon the professional integrity of the teachers alone adequately provides the requisite assurance of compliance with the First Amendment. The Supreme Court in *DiCenso* clearly refuted any contention that the state can, absent repeated prophylacic contacts with the institutions, ensure that state-subsidized teachers in nonpublic schools comport with constitutional limitations and standards.

Furthermore, the Commonwealth's history of assigning nurses to nonpublic schools pursuant to 24 P.S. § 14–1402 does not save Act 194.[12] Without passing upon the validity of that practice, suffice it to say that while a speech therapist's tasks arguably could be con-

---

12. 24 P.S. § 14–1402 provides:

Health services

"(a) Each child of school age shall be given, (1) a vision test anually by a school nurse, medical technician or teacher, (2) a hearing test employing an audiometer at least once every year in the elementary grades and once every two years in secondary grades by a school nurse or medical technician, (3) a measurement of height and weight at least once annually by a school nurse or teacher, and (4) a chest X-ray by a medical technician when the child is in high school.

"(a.1) Every child of school age shall be provided with school nurse services.

"(b) For each child of school age, a comprehensive health record shall be maintained by the school district or joint school board, which shall include the results of the tests, measurements and regularly scheduled examinations and special examinations herein specified.

"(c) Medical questionnaires, suitable for diagnostic purposes, furnished by the Secretary of Health and completed by the child or by the child's parent or guardian, at such times as the Secretary of Health may direct, shall become a part of the child's health record.

"(d) All teachers shall report to the school nurse or school physician any unusual behavior, changes in physical appearance, changes in attendance habits and changes in scholastic achievement, which may indicate impair-

ment of a child's health. The nurse or school physician or school dentist may, upon referral by the teacher or on his own initiative, advise a child's parent or guardian of the apparent need for a special medical or dental examination. If a parent or guardian fails to report the results to the nurse or school physician, the nurse or school physician shall arrange a special medical examination for the child.

"(e) The school physicians of each district or joint board shall make a medical examination and a comprehensive appraisal of the health of every child of school age, (1) upon original entry into school in the Commonwealth, (2) while in sixth grade, (3) while in eleventh grade, and (4) prior to the issuance of a farm or domestic service permit unless the child has been given a scheduled or special medical examination within the preceding four months. The health record of the child shall be made available to the school physician at the time of the regularly scheduled health appraisals.

"(f) The Secretary of Health, upon petition of the school board or joint school board or on his own initiative with the concurrence of the school board or joint school board, may modify for individual school districts the school health services program specified in this section. The program as modified shall conform to approved medical or dental practices and shall permit valid statistical appraisals of the various components of the program."

sidered as providing health care, I do not view them as synonymous with or comparable to the duties of nurses or doctors, or dentists. And certainly no respectable argument can be advanced for according guidance counselors this favorable inference. Finally, the drafting of 24 P.S. §§ 14–1401 and 14–1402 more clearly exemplifies statutes whose benefits provided thereunder are uniformly applicable to a general class.[13]

## V.

### Act 195 and the Instructional Materials Program

The validity *vel non* of the instructional materials provision of Act 195 is in many ways undistinguishable from the secular book provision. Nonetheless, for reasons which hereinafter follow, I find this program is constitutionally infirm under the First Amendment.

The invalidation of the instructional materials provision revolves more around primary effect than entanglement, although any administrative objections hereinafter noted for instructional equipment in Section VI, *infra,* are equally applicable to the instructional materials.

Section 1.12 of the Guidelines defines the kinds of materials available:

"Instructional Materials shall mean books, periodicals, documents, pam-

---

13. 24 P.S. § 14–1401 reads:

Definitions

"As used in this article—

"(1) 'Children of school age' or 'child of school age' means every child attending or who should attend an elementary grade or high school, either public or private, within the Commonwealth and children who are attending a kindergarten which is an integral part of a local school district.

"(2) 'Teachers' means professional employes, temporary professional employes and substitutes and instructors in public or private schools within the Commonwealth.

"(3) 'Other employes' means janitors, bus drivers, cooks and other cafeteria help and all others employed at schools.

"(4) 'School physician' means a physician legally qualified to practice medicine and surgery or osteopathy or osteopathic surgery in the Commonwealth, who has been appointed or approved by the Secretary of Health.

"(5) 'School dentist' means doctor of dental surgery or dental medicine legally qualified to practice dentistry in the Commonwealth, who has been appointed or approved by the Secretary of Health.

"(6) 'Family physician' means either a doctor of medicine legally qualified to practice medicine and surgery in the Commonwealth, or an osteopath or osteopathic surgeon legally qualified to practice osteopathy or osteopathic surgery in the Commonwealth, who has been designated by the parent or guardian as the personal physician of the child.

"(7) 'Family dentist' means a doctor of dental surgery or dental medicine legally qualified to practice dentistry · in the Commonwealth, who has been designated by the parent or guardian as the personal dentist of the child.

"(8) 'School nurse' means a licensed registered nurse who is assigned to a school district or joint school board, or a licensed registered nurse properly certificated by the Superintendent of Public Instruction as a school nurse who is employed by a school district or joint school board as a school nurse. The employment of any nurse employed by a school district or joint school board as a school nurse prior to the effective date of this act shall not be affected by a contract for school health services that may be entered into by any school district or joint school board under the provisions of this act.

"(9) 'Dental hygienist' means a dental hygienist licensed by the State Dental Council and Examining Board, who is assigned to a school district or joint school board or a dental hygienist licensed by the State Dental Council and Examining Board and certificated as a school dental hygienist by the Superintendent of Public Instruction, who is employed by a school district or joint school board as a dental hygienist. The employment of any dental hygienist employed by a school district or joint school board as a dental hygienist prior to the effective date of this act shall not be affected by a contract for school health services that may be entered into by any school district or joint school board under the provisions of this act.

"(10) 'Medical technician' means a person skilled in the operation of X-ray or other diagnostic equipment having such training and experience as required by the Secretary of Health.

"(11) 'Sanitarian' means a person having such training and experience as required by the Secretary of Health and qualified to conduct sanitary inspections of school buildings and grounds in connection with water supply, sewage and refuse disposal, food service, heating, lighting, ventilation and safety."

phlets, photographs, reproductions, pictorial or graphic works, musical scores, maps, charts, globes, sound recordings, including but not limited to those on discs and tapes, processed slides, transparencies, films, filmstrips, kinescopes and video tapes, or any other printed and published materials of a similar nature made by any method now developed or hereafter to be developed. The term includes such other secular, neutral, nonideological materials as are of benefit to the instruction of nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth."

Section 3.16 of the Guidelines notes in part:

"Inventory of Instructional Equipment and Materials

"a. Instructional materials loaned to the nonpublic schools shall be maintained on an inventory by both the nonpublic and the appropriate intermediate unit.

"b. It is presumed that instructional materials on loan to nonpublic schools after a period of time will be lost, missing, obsolete or worn out. These items should be so noted on an annual inventory."

Moreover, Sections 3.17(a) and 3.13(b) of the Guidelines, more fully described in Section VI, *infra*, must be complied with by the nonpublic schools.

A cardinal distinction between approving the loaning of secular books and the banning of instructional materials would be that ostensibly books are given directly to the children and derivatively the benefits are extended to their parents without any primary effect of aiding or inhibiting religion. Secondly, the costs of secular books are relatively nominal in contrast to the financial magnitude of the program here.

The crux of the case for me is whether you can by sophisticated accounting methods fund only secular programs in nonpublic schools, recognizing that a substantial monetary benefit is realized by the sectarian organization, without primarily aiding or advancing religion. For me the answer is unequivocally, emphatically and resoundingly NO. The primary effect gloss of such funding was first broached by Circuit Judge Coffin in DiCenso v. Robinson, 316 F. Supp. 112, 119–120 (D.R.I.1970), reiterated by Circuit Judge Anderson in Johnson v. Sanders, 319 F.Supp. 421, 424–434 (D.Conn.1970), aff'd, 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971), and the ramifications articulated by Judge Gurfein in Committee for Public Education and Relig. Lib. v. Nyquist, 350 F. Supp. 655, 665–667 (S.D.N.Y.1972).

Judge Anderson's incisive and most lucid comments in *Johnson, supra,* 319 F.Supp. at 424–434, should not go unheeded. After an exhaustive legal analysis, he concluded:

"Reason demands some outer limit to the defendants' contention that public funds and controls which are not literally earmarked to pay for or regulate religious instruction or observances can never be said to sponsor or otherwise establish an institution which is built around them. Abstract discussion of secular functions must not obscure the realities of how institutions such as schools operate. At one pole, it is clear that payment of aid directly to a religiously-affiliated educational institution does not automatically establish religion just because the sectarian activities of a school may be enhanced by anything which makes it more convenient for children to attend it. See Walz v. Tax Commission of City of New York, 397 U.S. at 671, 90 S.Ct. 1409, 25 L.Ed.2d 697. But at the other extreme, a law which converts a school's entire task of providing secular instruction from a purely private to a predominately state responsibility, while permitting religious instruction to continue unaltered, would constitute sponsorship of the school—the physical and administrative facility through which religion is taught—even if all public funds were formally designated to be spent

for functions other than teaching religion. The test for this sort of institutional sponsorship, which is a variety of 'excessive government entanglement with religion' analogous to 'releasing' public school students for private religious instruction in their schools, is 'inescapably one of degree.' See Walz v. Tax Commission of City of New York, 397 U.S. at 674, 90 S.Ct. 1409, 25 L.Ed.2d 697. If a law authorizes a religious group to participate in a contractual education program which requires the state to assume sponsorship of its entire non-religious scholastic curriculum, then the institution receiving funds and being regulated must be tested by standards of religious neutrality similar to those required of a public school." Id. at 433–434.

The use of Intermediate Units as conduits does not save this program or remove any constitutional defects. The benefits are as substantial for the nonpublic schools whether the money is paid to them directly or the materials are paid for by someone else. The Commonwealth's procedure mitigates the *entanglement* defect, but it does not avoid the *primary effect* shortcoming. Constitutional vulnerability is predicated on a disjunctive reading of the standards rather than requiring the conjunctive presence of all three criteria.

Thus, either on primary effect or entanglement grounds, this program should not be salvaged.

## VI.

### Act 195 and the Instructional Equipment Program

Providing instructional equipment under Act 195 to nonpublic schools similarly must not be upheld. Loaning of secular instructional equipment to nonpublic schools will require the same "comprehensive, discriminating and continuing state surveillance" stricken down in Lemon v. Kurtzman, 403 U.S. at 619, 91 S.Ct. at 2114. The majority, recognizing that at least for some equipment there will be a potential for constitutional abuse, considers severance an adequate remedy for rectifying this. One of my disagreements with the Court is the inadequate weight accorded the primary effect consequences of this legislation. A second area of difference is the intrusive entanglement of the nonpublic schools with the Commonwealth which the majority here minimizes and discounts.

Rather than "purchasing" the "secular educational services" from nonpublic schools as in Lemon v. Kurtzman, 403 U.S. at 609, 91 S.Ct. at 2109, the Commonwealth authorizes the Intermediate Unit to acquire this equipment and then loan it directly to the nonpublic schools. This procedure mitigates the previous approach of the Commonwealth by avoiding the provision of direct state financial aid via cash grants to the sectarian schools. *Id.* at 621, 91 S.Ct. at 2115.

Section 1.13 of the Guidelines defines the wide variety of equipment available under the Act:

"Instructional Equipment shall mean instructional equipment, other than fixtures annexed to and forming part of the real estate, which is suitable for and to be used by children and/or teachers. The term includes but is not limited to projection equipment, recording equipment, laboratory equipment and any other educational secular, neutral, nonideological equipment as may be of benefit to the instruction of nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth."

While projection equipment and recording equipment *per se* may be religiously neutral, this equipment can be misused and the carefully drawn statute of the legislature can be circumvented. A projector can be utilized to show religious films as easily as can the recording equipment be used to play records or tapes in a particular denominational vein.

Section 3.16 of the Guidelines provides in relevant parts:

"Inventory of Instructional Equipment and Materials

\* \* \*

"c. Instructional equipment loaned to nonpublic schools shall be maintained on an inventory by both nonpublic schools and the appropriate intermediate unit. After a period of 10 years these items shall be declared unservicable and the disposal of such shall be at the discretion of the Secretary of Education.

"d. Each nonpublic school shall submit to the local intermediate unit an inventory of all instructional materials and equipment on loan on or before June 1 of each fiscal year. Each intermediate unit should submit to the Secretary of Education a composite inventory of all instructional materials and equipment on loan, on or before June 30 of each fiscal year."

Sectional 3.17 further states:

"Payment

"a. The intermediate unit will receive the allocations for the nonpublic school children and render the necessary accounting procedures and reports."

Read in conjunction with 3.17(a) should be Section 3.13(b):

"Each nonpublic school shall be responsible to insure that requests for expenditures shall not exceed allocations. In the event that this occurs it is understood that each nonpublic school shall be responsible for any expenditure in excess of its allocation."

In Lemon v. Kurtzman, 403 U.S. at 621, 91 S.Ct. at 2115, the power of the Commonwealth to conduct a post-audit of the sectarian school's financial records was singled out as being indicative of the entangling relationship between Church and State which should be eschewed. Moreover, the Court was wary of regulations which might be pro-

mulgated in order to implement any of the programs. Thus, the *potential* for entanglement as much as the actual practices in existence, alarmed the Court and was an important, if not overriding, concern in reaching its judgment.

Wholly apart from the vitiating administrative facets of Act 195 hereinbefore mentioned, the majority appears to minimize as being constitutionally insignificant the fact that the instructional equipment and instructional materials are given to the schools rather than the children as is the case for the textbooks. Nothing in the Act compels the schools to maintain any minimum level of expenditures as an offset for receipt of these items. In effect, the Court is saying that whenever a state provides purely secular equipment for a religious school, there can be no primary effect of advancing or inhibiting religion irrespective of the extent of the economic assistance to the institution. This is a conclusion which I am unable to fully accept. The majority reads the First Amendment restrictions in an exceedingly narrow fashion. Thus this neat categorization and compartmentalization purportedly enable the Commonwealth to pay for only secular equipment which in the past was entirely paid for by the nonpublic schools, now freeing the schools' monies for sectarian uses. To me, this is a clear sponsorship of religion by the Commonwealth without exacting any correlative promises that these benefits are administered in a constitutionally nondiscriminatory fashion.

The class nature of this legislation with its primary effect overtones as well as the ongoing administrative entanglement aspects of the Act leads me to the same conclusion that this program should not be sustained in any part.

VII.

*Political Divisiveness, the Free Exercise Clause, and the Equal Protection Clause*

Defendants have also attempted to analogize these programs to those ap-

proved in Walz v. Tax Commission of City of New York, *supra*; Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), and Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). Any reliance upon those authorities is misplaced, as the factual underpinnings of those cases are clearly distinguishable.

We do not have as in *Walz,* 397 U.S. at 678, 90 S.Ct. at 1416, the tradition and experiences of two centuries of un-interrupted freedom from taxation for churches. Nor as in *Tilton* and *Hunt* does this case involve (1) a "one-time, single-purpose construction grant," *Tilton, supra,* 403 U.S. at 688, 91 S.Ct. at 2100; (2) to a *college* whose students are less impressionable and where presumably less emphasis is placed on religious indoctrination;[14] and (3) where the nature of the program entails limited government surveillance in order to fully comport with the First Amendment guarantees.

Moreover, the potential for political divisiveness and dissension adumbrated by Chief Justice Burger in Lemon v. Kurtzman, 403. U.S. at 623–625, 91 S.Ct. at 2116–2117, is equally controlling here and extremely compelling:

"The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow."

\*　\*　\*　\*　\*　\*

"We have already noted that modern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach 'the verge,' have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a 'downhill thrust' easily set in motion but difficult to retard or stop. Development by momentum is not invariably bad; indeed, it is the way the common law has grown, but it is a force to be reckoned with. The dangers are increased by the difficulty of perceiving in advance exactly where the 'verge' of the precipice lies. As well as constituting an independent evil against which the Religion Clauses were intended to protect, involvement or entanglement between government and religion serves as a warning signal."[15]

Other arguments urged by the proponents of these programs must similarly be rejected as unfounded and unsound. In Committee for Public Ed. & Religious Lib. v. Nyquist, 413 U.S. 756, 93 S.Ct. at 2973, Mr. Justice Powell, writing for the Court, almost summarily dismissed any contention predicated on the Free Exercise Clause of a right to state aid.

"It is true, of course, that this Court has long recognized and maintained the right to choose nonpublic over public education. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). It is also true that a state law interfering with

14. The Commonwealth conceded, after examination by the Court during argument on the propriety of the preliminary injunction, that at least the 986 Roman Catholic Diocesan Schools in the Commonwealth eligible under Acts 194 and 195 have a religious purpose. See N. T. of September 13, 1973 at 161.

15. See also concurring comments of Mr. Justice Harlan in Walz v. Tax Commission of City of New York, 397 U.S. at 699, 90 S.Ct. at 1427:

"Subsidies, unlike exemptions, must be passed on periodically and thus invite more political controversy than exemptions. Moreover, subsidies or direct aid, as a general rule, are granted on the basis of enumerated and more complicated qualifications and frequently involve the state in administration to a higher degree, though to be sure, this is not necessarily the case."

a parent's right to have his child educated in a sectarian school would run afoul of the Free Exercise Clause. But this Court repeatedly has recognized that tension inevitably exists between the Free Exercise and the Establishment Clauses, e. g., Everson v. Board of Education, supra; Walz v. Tax Commission, supra, and that it may often not be possible to promote the former without offending the latter. As a result of this tension, our cases require the State to maintain an attitude of 'neutrality,' neither 'advancing' nor 'inhibiting' religion. In its attempt to enhance the opportunities of the poor to choose between public and nonpublic education, the State has taken a step which can only be regarded as one 'advancing' religion. However great our sympathy, Everson v. Board of Education, supra, 330 U.S. at 18, 67 S.Ct. at 513 (Jackson, J., dissenting), for the burdens experienced by those who must pay public school taxes at the same time that they support other schools because of the constraints of 'conscience and discipline,' ibid., and notwithstanding the 'high social importance' of the State's purposes, Wisconsin v. Yoder, 406 U.S. 205, 214, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), neither may justify an eroding of the limitations of the Establishment Clause now firmly emplanted." (Footnote omitted).

*Accord,* Johnson v. Sanders, *supra,* 319 F.Supp. at 435; Wolman v. Essex, *supra,* 342 F.Supp. at 418–419; Kosydar v. Wolman, *supra,* 353 F.Supp. at 764.

Another argument of the defendants premised on the Equal Protection Clause can additionally be given short shrift. Chief Justice Burger, while concededly addressing a different constitutional question, spoke of the interplay between the Equal Protection Clause and the First Amendment. In Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723 (1973), where the Court barred nonpublic schools engaged in racial discrimination from receiving free textbooks from the state, the Chief Justice reasoned:

"Appellees fail to recognize the limited scope of Pierce when they urge that the rights of parents to send their children to private schools under that holding is at stake in this case. The suggestion is made that the rights of parents under Pierce would be undermined were the lending of free textbooks denied to those who attend private schools—in other words, that school children who attend private schools might be deprived of the equal protection of the laws were they invidiously classified under the state textbook loan program simply because their parents had exercised the constitutionally protected choice to send the children to private schools.

"We do not see the issue in appellees' terms. In Pierce, the Court affirmed the right of private schools to exist and to operate; it said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise. *It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.*

"The appellees intimate that the State must provide assistance to private schools equivalent to that it provides to public schools without regard to whether the private schools discriminate on racial grounds. Clearly, the State need not. Even as to church-sponsored schools, whose policies are nondiscriminatory, any absolute right to equal aid was negated, at least by implication, in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Religion

Clauses of the First Amendment strictly confine state aid to sectarian education. Even assuming, therefore, that the Equal Protection Clauses might require state aid to be granted to private nonsectarian schools in some circumstances—health care or textbooks, for example—a State could rationally conclude as a matter of legislative policy that constitutional neutrality as to sectarian schools might best be achieved by withholding all state assistance. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L. Ed.2d 16 (1973). In the same way, a State's special interest in elevating the quality of education in both public and private schools does not mean that the State must grant aid to private schools without regard to constitutionally mandated standards forbidding state-supported discrimination. That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination." (Emphasis added.)

In Sloan v. Lemon, *supra,* 413 U.S. 825, 93 S.Ct. at 2987–2988, Mr. Justice Powell also refused to allow parents of children attending nonsectarian nonpublic schools in Pennsylvania to receive the tuition reimbursements. The severability clause was insufficient justification to exclude nonsectarian schools from the ban since it could not be presumed such legislation would have been enacted by the Commonwealth were it only to encompass such a small class of beneficiaries.

## VIII.

### Conclusion

Plaintiffs in my view are entitled to a preliminary injunction barring the expenditure of funds under Acts 194 and 195, except for the secular textbooks which I would permit. Because of this approach, I find it unnecessary to decide whether there is any free exercise violation to plaintiffs in that there was compulsory taxation for the support of religion or religious schools.

Tragically, some persons, before the ink here is hardly dry, will claim that the dissent is anti-religious or fails to appreciate the importance of religion and religious education in our society. Such distortions would be far from the truth. Each of my children, as a matter of parental choice, has attended nonpublic schools which have a religious focus and are sponsored by a religious body. But it was a private choice; the taxpayers under the constitution are not permitted to pay the price for my religious preferences.